SAMUEL D. BELL,<br>
J. E. SARGENT,<br>
HENRY A. BELLOWS,<br>
GEORGE W. NESMITH,<br>
WILLIAM H. BARTLETT.

</div>

July 29th, 1864.

---

## OPINION

OF THE JUSTICES OF THE SUPREME JUDICIAL COURT ON THE CONSTITUTIONALITY OF THE SOLDIERS' VOTING BILL.

---

*To the Honorable Senate of the State of New Hampshire:*

We the undersigned, Justices of the Supreme Judicial Court, have taken into consideration your resolution asking for our opinion upon the constitutionality of a bill entitled An act to enable the qualified voters of this State, engaged in the military service of the country, to vote for Electors of President and Vice President of the United State, and for Representatives in Congress.

The bill provides that qualified voters of this State, in the military service of the United States, with certain exceptions, may vote for Electors of President and Vice President of the United States, and for Representatives of this State in the Congress of the United States, at the places where the voters may be, on the days fixed for those elections, instead of giving their votes, as the law has heretofore required, in the towns and places in this State, where they at the time resided.

Whether good policy requires this change in the law to be made, and whether the bill provides in the safest and most judicious way for the manner of exercising the right to vote in places other than those where the voters reside, are questions resting wholly in the discretion of the legislature, and are not submitted to our consideration. The only in-

quiry for us, we understand to be, whether the·legislature have constitutional power to pass the law. On examination of the bill, we have not found any question which appeared to require our consideration, except the general question whether the legislature, under the Constitution of the United States and the Constitution of this State, have power to authorize votes for the officers above named, to be given in any other place than the places where the voters reside at the time of the election.

Upon consideration and consultation, we have come to the conclusion that the bill is free from constitutional objection.

It may be proper to remark that we have not had opportunity to confer with Mr. Justice Doe on this subject, and so far as we are informed, your resolution has not yet been submitted to him.

We understand it is desired that our opinion should be given before the impending adjournment of the legislature. We have on that account taken pains to give your requisition prompt attention, and now submit the result of our examination without waiting to state the reasons upon which our opinion is founded. We may take occasion to explain the grounds of our opinion hereafter.

We therefore certify our opinion to be that the bill aforesaid is free from constitutional objection, and that the legislature have constitutional power to pass the same.

IRA PERLEY,
J. EVERETT SARGENT,
HENRY A. BELLOWS,
GEO. W. NESMITH,
WILLIAM H. BARTLETT.

---

The Justices of the Supreme Court were required in August last to give their opinion upon the constitutionality of a bill, passed by the Senate and House of Representatives, entitled An act to enable the qualified voters of this State, engaged in the military service of the country, to vote for Electors of President and Vice President of the United States, and for Representatives in Congress. Understanding that the public convenience called for a prompt answer to the question proposed, we then returned one, merely stating the conclusion to which we had arrived, but intimating that we might take occasion to explain the reasons upon which our opinion was founded, at a future time. By way of complying with this intimation we propose to furnish the Reporter of the Court with these our reasons for the opinion heretofore certified:

The bill provides that all qualified voters of this State, who shall be in the actual military service of the United States, on the days duly appointed by law for the choice of Electors of President and Vice President of the United States, and for representatives of this State in the Congress of the United States, shall be entitled to exercise the right of

suffrage for said officers at the several posts, camps and places where the regiment, battery of artillery, or part of a regiment not less than one company under a separate command, may be on said days, as fully as if such voters were present at the place in this State where such election may be held, and where such person would be entitled to vote, any provisions of law now in force notwithstanding : *Provided*, that this section shall not extend to, or include any person in the regular or standing army of the United States, nor any person in any regiment, battery or company organized or officered out of this State. The bill provides in detail for the manner of holding the elections and returning the votes.

Whether sound policy calls for this proposed change in the law, and whether the provisions of the bill intended to ensure the free and safe exercise of the right of suffrage are the best that could be devised, are questions resting wholly in the discretion of the legislature, and which we are not required to consider. The general object of the bill is to allow voters in the military service to give their votes where they may happen to be at the time of the elections, instead of voting at meetings held in the towns and places where they reside in this State. We do not perceive that any constitutional question arises out of the manner in which the bill proposes to accomplish this object. We may, therefore, excuse ourselves from examining the provisions of the bill in detail, and confine our inquiry to the single question, whether, under the Constitution of the United States and the Constitution of this State; the legislature have constitutional power to authorize votes for Electors of President and Vice President, and for Representatives in Congress, to be given at other places than those where the voters reside, and at places beyond the territorial limits of this State.

It belongs to the legislative department of the government to decide who shall have the right of voting, what shall be the qualifications of voters, and when and where the qualified voters shall exercise the right, except so far as the legislative authority is limited and restrained by the fundamental law ; and this general authority over the whole subject belongs to the legislature of this State, with such limitations only as are imposed by the Constitution of this State and that of the United States.

There is nothing inherent in the nature of the right to vote which requires the voter to exercise the right in the place where he resides, and the history of popular elections in this State, so far as we are able to trace it, shows that it has never been regarded here as an essential ingredient of the right of suffrage, that it should be exercised in the place where the voter resides. A large proportion of our towns now hold their corporate powers under no other charters or acts of incorporation than the original proprietary grants of land from the royal government. In the outset, the proprietors of these townships resided for the most part in other governments, and their meetings for regulating the affairs of the townships were frequently, and, we believe, for no short period, generally, held where the proprietors resided in Massachusetts and Connecticut. When and by what process these proprietary meetings of the townships

were superseded in the general management of public affairs by meetings of the inhabitants residing within the territorial limits of the township, we are not able to trace. It appears, however, by the recital of the Provincial act of 1719, that it had then been "a continued practice and custom in the several towns within the Province to choose selectmen or townsmen for the ordering and managing the prudential affairs of such towns," and that act, which provides for the annual meetings of the inhabitants in March, for the choice of town officers, is the first we find that defines or gives the right of suffrage in New Hampshire for any purpose. The act defines the qualifications of the voters, and, by fair implication, though not in express terms, required the meetings to be held within the limits of the respective towns.

The act of 1719 provided for the election of town officers only, and there does not appear to have been any act prescribing the manner of choosing assemblymen, or any other than town officers, until 1737, when the act of that year was passed providing that "no person should have the liberty of voting in the election of representatives to the assembly other than such who has an estate of the value of fifty pounds within the town, precinct or parish where such election shall be ;" and the same act provided that "any person having a real estate of fifty pounds as aforesaid, should have the liberty of voting in the town, precinct or parish where such his estate should be, although he be not an inhabitant of the town," &c., "at the time of such election ;" and in the subsequent acts for assessing taxes, this provision allowing non-residents to vote where their lands lay is expressly excepted from the operation of these acts. The right of non-residents to vote where they had land which gave them the required property qualification, remained in force until it was repealed by the act of June 20, 1793, unless the constitution of 1783 took it away by implication.

This glance at the history of popular elections of New Hampshire is sufficient to show, that, with us, as elsewhere, the right of suffrage under the Provincial and State governments has been regarded and treated as wholly within legislative control, except so far as the legislative authority over the subject has been restrained by the Constitution of this State, or that of the United States ; and in particular that the legislature have been understood to have the power, except in cases where they are restrained, by constitutional limitations, to authorize votes to be given in other places than those where the voters reside.

It may be remarked that requiring the voter to have the qualification of residence or property in the town or district where his vote is to be counted and reckoned in the election is quite a different thing from requiring him to exercise the right of voting in the place where his residence or the holding of property gives him such an interest in the welfare of the town or district as may be supposed to ensure the honest and careful exercise of the right.

We may safely stand, we think, on the position that there is nothing in the nature of popular elections which, in the absence of positive provisions on the subject, requires that the right of suffrage should be exercised in the place where the voter resides ; and that in New Hampshire

this right, so far as concerns the time, place and manner in which it is to be exercised, has always been regarded and is now to be regarded as wholly within legislative control, except so far as the power of the legislature over the subject has been limited and taken away by the constitution of this State or of the United States, and the single question is whether the bill submitted to us is in conflict with the Constitution of this State or that of the United States.

This question we regard as new in this State, inasmuch as the opinion heretofore given by four Justices of this Court was in reference to an act of essentially different character, and relating to a different subject. We do not understand that the question as to the distinction between the right to vote in the election of State, county and town officers, and the right to vote for Electors of President and Vice President, and for Representatives in Congress, was considered in that opinion. The bill then under consideration, as stated in the opinion, related to the election of State, county and town officers, and any general expressions used could not have been intended to have an application more extensive than the subject matter then under consideration. We find in that opinion no mention of the Constitution of the United States, whereas the question as to the election of Representatives to Congress and of Electors of President and Vice President is governed wholly by the Constitution of the United States as the paramount law, and the Constitution of this State has no concern with the question, except so far as it is referred to and adopted by the Constitution of the United States.

The appointment of Electors of President and Vice President, and the election of Representatives in Congress depend on different provisions of the Constitution of the United States. There are two provisions of the Constitution relating to the appointment of electors, both contained in the first section of the second article. The first of these provisions is in these terms : "*Each State shall appoint in such manner as the legislature thereof may direct*, a number of electors equal to the whole number of Senators and Representatives to which the State may be entitled in Congress." The other provision is as follows : "The Congress may determine the time of choosing electors, and the day on which they shall give their votes, which day shall be the same throughout the United States." Congress have exercised the power thus delegated to them by the act of January 23, 1845, fixing the day on which electors are to be chosen, and the act of March 1, 1793, fixing the day on which their votes are to be given. The bill referred to us, corresponds in this respect with the laws of Congress, and the only question on this branch of the subject is, whether the manner in which this bill provides for the appointment of electors is authorized by the Constitution of the United States.

It is to be observed that the appointment of electors is the act of the State in her sovereign capacity. The State appoints the electors, and the Constitution imposes on her no restraint as to the manner in which she shall perform this act of sovereignty, except as to the time when the act shall be done. Each State makes the appointment in such manner as the legislature thereof may direct. No appeal to the people by popular

election in any form is required by the Constitution; excepting only the time, the whole question as to the manner in which the State shall appoint the electors is left wholly to the discretion of the State legislature.

This bill proposes that the electors shall be appointed on the day which Congress has designated, by popular vote of all the qualified voters of the State; those voters who are in the military service to give their votes in the places where they may be on the day of the election, and other voters in the towns and places where they reside.

We have not found it easy to see what valid legal objections there can be to this exercise of the unlimited authority given by the Constitution of providing for the appointment of electors "in such manner as the legislature may direct." By the Constitution the electors are to be appointed in such manner as the legislature may direct. The legislature have exercised the authority thus conferred by directing that the electors shall be appointed by the votes of all the qualified voters of the State given as before mentioned. The power to direct that the appointment shall be made in this manner is clearly within the letter of the constitutional provision; and we can see no ground for a construction that shall limit and restrain the plain meaning of the language used on this point in that instrument.

In practice under the Constitution, very great latitude has been assumed in exercising the unqualified discretion left to the States of appointing electors in such manner as the State legislature may direct. In one at least of the States, we understand that the choice of electors has never been submitted to any popular election. In some cases, States have been divided into districts for the choice of electors. In this State, we believe the electors have always been chosen for the whole State and not by districts; but in other respects the appointment has been made here at different times in various ways as the legislature have from time to time directed. In the first election of President, there was a failure in this State to appoint electors by the law enacted on that subject in 1788, and after several unsuccessful attempts by other methods, the Senate chose the five electors and the House concurred in the choice. On failure to elect by other methods, the law, in several instances, as in the act of 1824, has provided for a resort to the drawing of lots among the candidates. In 1800 the legislature again took the matter into their own hands, and chose the six electors in convention of the two houses. It would seem to have been formerly regarded as a matter so entirely within the discretion of the legislature for the time being, that the acts passed on the subject were not printed in the general edition of the laws till that of 1830. We find no act on the subject in the edition of 1808 or 1818.

Under the Constitution, the States appoint the electors. The appointment is to be made in such manner as the legislature may direct. The whole discretion as to the manner of the appointment is lodged, in the broadest and most unqualified terms, in the legislature. In different States and at different times in the same State, the greatest diversity as to the manner of appointment has prevailed. Whether, therefore, we look to the broad and comprehensive provisions of the Constitution, or

to the construction which they have received in practice, we can see no room for serious doubt that the legislature, being clothed with this general authority to direct the manner in which the electors shall be appointed, have acted within the scope of their constitutional powers in directing that the appointment shall be made by the votes of all the qualified voters of the State; the voters in the military service giving their votes at the places where they may be on the day of the election, and the other voters in the towns and places where they reside.

The question submitted to us, so far as it relates to the choice of Representatives in Congress, depends upon other provisions of the Constitution, and requires a separate consideration.

There are two clauses of the Constitution which bear on the subject; one in the second section of the first article in the following terms: "The House of Representatives shall be composed of members chosen every second year by the people of the several States; and the electors in each State shall have the qualifications requisite for electors of the most numerous branch of the State legislature." The other clause in the fourth section of the same article is as follows: "The times, places and manner of holding elections of senators and representatives shall be prescribed in each State by the legislature thereof; but Congress may at any time by law make and alter such regulations, except as to the place of choosing senators."

The authority of the State legislature to prescribe the time, place and manner of holding elections for representatives in Congress, is derived from this last provision of the Constitution of the United States. Their action on the subject is not an exercise of their general legislative authority under the Constitution of the State, but of an authority delegated by the Constitution of the United States; and the question here is, whether the Constitution of the United States authorizes the State legislature to prescribe such places for holding elections of Representatives in Congress as are provided for in this bill. The constitution and laws of this State are entirely foreign to the question, except so far as they are referred to and adopted by the Constitution of the United States.

The electors of representatives in Congress must have the qualifications requisite for electors of the most numerous branch of the State legislature. The most numerous branch of our legislature is the House of Representatives. By our Constitution all persons qualified to vote in the election of State senators are entitled to vote within the district where they dwell, in the choice of representatives. The electors of State senators and representatives being required to have the same qualifications, it follows that electors of representatives in Congress must have the qualifications required by our State constitution in the electors of State senators.

That part of our Constitution which relates to the election of senators is in the following terms: "The senators shall be chosen in the following manner to wit: Every male inhabitant of each town and parish with town privileges, and places unincorporated in this State, of twenty-one years of age and upwards, excepting paupers and persons excused from paying taxes at their own request, shall have a right at the annual

and other meetings of said towns and parishes, to be duly warned and holden annually in the month of March, to vote in the town or parish wherein he dwells, for senator in the district whereof he is a member." In the constitution of 1783, from which the foregoing provision is in substance adopted, there immediately followed an explanatory clause in these terms : "and every person qualified as the constitution provides *shall be considered an inhabitant* for the purpose of electing and being elected into any office or place within this State in the town, parish and plantation where he dwelleth and hath his home." The same explanatory clause is found in the constitution of 1792, but in that it is separated from the preceding provision on the same subject by a proviso. There is no reason, however, to suppose that by assigning this clause a different place in the instrument there was an intention to give it a more extended meaning in the present Constitution than it has in the preceding.

If the provisions of the State Constitution make it a *qualification* of the voter for senators, within the meaning of the word *qualifications* as used in the Constitution of the United States, that the vote should be cast in the place where the voter resides, then the legislature have not constitutional power to authorize votes for Representatives to be given in other places than those where the voters dwell.

It is a rule of construction applicable to this case, that, where in any law or written instrument, a word or phrase is found which is capable of more than one meaning, it shall be understood in that sense which is most common and usual, unless there is something in the subject matter or context to control the rule. Now it would be an artificial and forced construction to hold, that, in speaking generally of the *qualifications* of a voter, it would be intended to include as a qualification the place where by law he was required to give his vote. We should rather suppose that reference was intended to be made to age, fixed residence, property and other such like qualifications, which the law might consider as necessary to guard against the danger of confiding the elective franchise to persons who have not sufficient intelligence and sufficient personal interest in the election to ensure an intelligent and honest exercise of the right, and not to such incidental circumstances as the time when or the place where the voter, having such qualifications, should cast his vote. There is every reason to suppose that such is the point of view from which the framers of the Constitution would contemplate this question. It was then, and has not ceased to be now, one of the most difficult problems in popular government to determine how far the elective franchise shall be extended, to what *class of persons* it can be safely entrusted ; and the *qualifications* of that class have not usually, if they have ever, been treated either in the discussions of practical statesmen or the speculations of theoretical writers, as extending either to the time when or the place where the otherwise qualified voter was to exercise the right of suffrage. When the framers of the Constitution referred the choice of Representatives in Congress to a popular election by the votes of those who had the qualifications of electors for the most numerous branch of the State legislature, we cannot think that they intended to embrace in the term *qual-*

*ifications* such an incident as the place where the voter was to cast his vote.

There is no reason to suppose that in the political phraseology of the time, the term *qualification*, when applied to the subject of electors, was understood to embrace such a circumstance as the place where the vote was to be given; and this may be fairly inferred from the language of our own Constitution. Thus, by the 30th section, "every person *qualified* as the constitution provides shall be considered as an inhabitant, &c., in the town, &c., where he dwelleth and hath his home." Here the Constitution defines where the person who has the *qualifications* required by the Constitution shall be considered as an inhabitant, of course, he is to exercise the right of voting, which is entirely inconsistent with the notion that the place where he is required to vote was regarded as one of the qualifications of the voter. So the 31st section provides for the place where the inhabitants of plantations and unincorporated places "*qualified* as this constitution provides" shall have the privilege of voting. Then again, the collocation and connection of parts in the constitutional provision relating to the election of senator, though in themselves by no means of decisive weight, are not without their bearing on this point. "Every male inhabitant—of twenty-one years of age —shall have a right," &c. The right is thus given to the person having the qualifications before enumerated; and then comes the clause which shows when and where the persons having those qualifications shall exercise the right, to wit, at the town meetings held in the month of March, annually, and in the town or parish wherein he dwells.

It is worthy of remark that the State Constitution fixes the time when, as well as the place where, the voter shall exercise the right of voting for senator, to wit, in the month of March annually. And if the place of voting fixed by the Constitution is a qualification of the voter, it is not easy to see why the time fixed by the same instrument for his voting is not equally so. Yet it has never been understood that the time when the vote is to be given for senator is a qualification of voters for Representatives in Congress within the meaning of the Constitution; for until within a comparatively recent period, the time for election of Representatives in Congress was fixed by our statute in a different month than March.

In recent discussions on this subject, the place where the elector is required to vote has been treated as a thing quite distinct from the qualifications of the elector. Thus, in the elaborate opinion of Mr. Justice Woodward, of Pennsylvania, in the case of *Chase* v. *Miller*, he takes the distinction between the qualifications of the voter and the place where the constitution requires that his vote shall be cast in the following terms : "Our constitution and laws treat the elective franchise as a sacred trust, committed only to that portion of the citizens who come up to the prescribed standard of *qualifications*, and to be exercised by them at the time and place, and in the manner prearranged by public law." So, in the opinion of the Connecticut judges on the constitutionality of the soldiers' voting law in that State, they use the following language on this subject: "In relation to the time, place and manner of holding elections

the constitutions of the several States differ. In some of them, all three are prescribed with that particularity which forbids all action of the legislature. In others, neither is prescribed, but the *qualification* required of the voter is fixed, and the power to regulate the time, place and manner committed to the legislature." This passage from the opinion of the Connecticut judges is quoted and adopted by the supreme court of Iowa, in the case of *Morrison* v. *Springer.* The opinion of the judges in Vermont on the soldiers' voting law of that State, necessarily involves the conclusion that the place where the voter is required to vote is not a qualification of the voter within the meaning of that term as used in the Constitution of the United States.

It was perhaps unnecessary to enter on any general consideration of the meaning of this term *qualification* when used in reference to a voter in a popular election, inasmuch as the other provision of the Constitution on this subject, before cited, would seem to place it beyond doubt that it could not have been intended under this term to include the place where, by the State Constitution, the voter was required to cast his vote in the election of State representatives. For the Constitution of the United States in the 4th section of the first article provides that "the times, places and manner of holding elections for senators and representatives shall be prescribed in each State by the legislature thereof; but the Congress may at any time, by law, make or alter such regulations, except as to the places of choosing senators." Here the place where the elector is to vote is spoken of, not as one of his qualifications, but as a mere regulation for the exercise of his right. If, under the Constitution of this State, it were a qualification of the elector of Representatives in Congress that he should cast his vote in the town or place where he resides, then neither Congress nor the State legislature could give him the right to cast his vote elsewhere, and the provision giving the legislature authority to prescribe the place of voting would be wholly inoperative. But, by the express terms of the Constitution, if the legislature neglect to prescribe the places for holding elections of Representatives, Congress may designate the places; and if the legislature have prescribed the places, Congress may at any time interfere and alter them. The legislature of this State, under authority given by the Constitution of the United States, prescribe the times and places for holding those elections, to wit, in the month of March, biennially, and in the towns and places where the voters reside. But Congress have authority to alter both the time and place; they may establish election districts different from the towns and places where the voters reside; they may establish several election districts in the same town, or include more than one town in the same election district, and until Congress shall interfere, the power of the State legislature over this subject must be co-extensive with that of Congress.

This power reserved to Congress of making and altering regulations respecting the time, place and manner of choosing representatives, has never yet, so far as we are informed, been exercised, but it is clearly given by the Constitution, and was doubtless intended to clothe Congress with the power to provide for the time, place and manner of holding the

elections, if the State legislature should neglect to do it, and to correct possible abuses in the exercise of the power thus given to the State legislature. For instance, if Congress should be of opinion that the bill submitted to us would lead in practice to abuses, that ought to be corrected, they might under the Constitution alter the places for holding elections and provide that they should be held only in the places where the voters reside, or in any other election district that the act of Congress might prescribe.

This provision of the Constitution, which gives the State legislature authority to prescribe the time, place and manner of holding elections, but reserves to Congress the power to make and alter such regulations, leaves no ground for serious doubt that the Constitution regards a law which prescribes the place where an elector shall vote, as a mere regulation for the exercise of his right, and not as a qualification of the elector within the meaning of the term as used in the Constitution; and therefore the legislature, under the Constitution of the United States which gives them authority to prescribe the place of holding elections for Representatives in Congress, exercise that authority untrammeled by the provision of the State constitution, which requires the elector of State representatives to give his vote in the town or place wherein he resides.

There have been several cases in other States where the power of the legislature to authorize the votes of soldiers to be taken in places out of the State has been considered.

The opinion of the judges in Connecticut was given on the constitutionality of the law passed there in 1862. The opinion in that case is confined strictly to the construction of the State constitution. Nothing is said of the right to vote for Representatives in Congress, or for Electors of President and Vice President, and no allusions made to the Constitution of the United States. The application of their opinion and reasoning is strictly confined to the State constitution. The formal opinion is certified in the following terms: "Upon such consideration we have unanimously certified to the governor, that, in respect to the election of governor and lieutenant governor, treasurer, secretary, comptroller and members of the general assembly, the act is unconstitutional." In that case the opinion was certified to the governor, and the reasons of it afterwards furnished to the reporter, as we propose to do in this case.

In Pennsylvania, the question upon the constitutionality of the act of that State, allowing soldiers to vote in the army, arose in the case of *Chase* v. *Miller*, which came before the court on *certiorari*, and assumed the form of a proceeding at law between the rival candidates for district attorney of Lucerne county. The legal question before the court was whether the "army vote" should be counted in the election of that State officer, and arose upon the Constitution of Pennsylvania in reference to that election. The question before the court was strictly confined to the construction of the State constitution in reference to the election of a State officer. The learned Judge who delivered the opinion of the court, felt called on to indulge in some remarks on the impolicy and danger of allowing voters to cast their votes at a distance from

the neighborhood where they resided and were best known; and these remarks might apply with equal force to an election of Representatives in Congress or Electors of President and Vice President; but the only point before the court and the whole discussion related solely to the construction of the State Constitution. Nothing was said or was required to be said on the Constitution of the United States, or of the distinction between elections of State officers and of Representatives in Congress and Electors of President and Vice President. The court in that case held the act to be unconstitutional as to the election to the office of district attorney, and the opinion would apply to the election of State officers generally, as we understand the laws of Pennsylvania.

In *Morrison* v. *Springer*, the Supreme Court of Iowa decided that the law of that State, allowing soldiers to vote in places out of the State, was not in violation of the State Constitution. The question grew out of an election for clerk of the district court, a State officer, and the opinion turned wholly on the construction of the State Constitution.

In these cases arising on the construction of State constitutions, there was no question nor any discussion upon the construction of the Constitution of the United States, or of the several States, in reference to the election of Representatives in Congress, or Electors of President and Vice President, and, though they may be valuable for the light they shed on the general subject, they cannot be regarded as in point for our present inquiry.

The only authority we have met with which appears to be directly in point for the present case, is the opinion of the Justices of the Supreme Court of Vermont, upon the constitutionality of an act of that State passed in November, 1863, entitled An act providing for soldiers voting. The provisions of that act are substantially like those of the bill submitted to us. There is no difference that can be supposed to affect the question of constitutional power to pass them. In that case the judges were unanimous in their opinion, that, under the Constitution of Vermont the legislature could not authorize votes for State officers, including representatives to the assembly, the most numerous branch of the legislature, to be given at other places than those where the voters resided in Vermont. Our Constitution and that of Vermont agree in requiring that votes for Representatives in the State legislature shall be given in the towns and places where the voters reside. The six Justices of the Supreme Court of Vermont agreed in the opinion that the act of that State, so far as it related to the election of Representatives in Congress and Electors of President and Vice President, was constitutional.

In reference to the election of Representatives in Congress, their conclusion is stated as follows : "These are the only clauses of the Constitution bearing upon the election of Representatives in Congress. It cannot be claimed that anything is established by these as to the time or place of voting. The whole subject is entrusted to the State legislature, subject to the control of Congress. As we have already seen, if the the Constitution does not prescribe the time and place, it rests wholly in the discretion of the legislature to establish them by law." And, with respect to the choice of Electors of President and Vice President, they

say: "Upon the principles already alluded to, there would seem to be no ground to question the power of the legislature to authorize voting for electors as they have done by this bill."

These questions were very deliberately and ably considered by the learned judges of Vermont. Their opinion we regard as directly in point, and, after a careful examination of the question, we have found no difficulty in arriving, as they did, at the conclusion that the bill submitted to us is free from constitutional objection.

> IRA PERLEY,
> J. E. SARGENT,
> HENRY A. BELLOWS,
> GEO. W. NESMITH,
> WM. H. BARTLETT.