To the House of Representatives:
The undersigned have received a copy of a resolution passed by your honorable body, requiring our opinions on the right of the state to purchase the property described in the resolution as "the Concord Railroad." That property is no exception to the rule that private property may be taken for public use on payment of its value to its owners, and the property in question cannot be purchased or taken by the state for less than its value without the owner's consent. As this answer seems to be for practical purposes a compliance with the requisition of the house, it is deemed unnecessary at the present time to give a more specific and extended opinion. Understanding that the house desire an immediate *Page 630 
answer, we submit the conclusion at which we have arrived, without stating reasons, which will be given at a future day. 45 N.H. 596.
Concord, March 31, 1891.
 C. DOE. W. H. H. ALLEN. ISAAC W. SMITH. LEWIS W. CLARK. I. N. BLODGETT. A. P. CARPENTER.
Notice of a public hearing having been given, the questions proposed by the house were argued by counsel March 30, 1891. This statement of the reasons of the opinion that was given the next day follows the course of the argument that was presented in support of the opposite opinion.
I. The first ground on which it was claimed that the state can take the Concord Railroad on paying its owners less than its value is, that the constitution of New Hampshire does not require compensation to be made for private property taken for public use, and that the state is not bound by contract or otherwise to refrain from partial confiscation. By the first section of the Concord charter, Isaac Hill and others, and their associates, successors, and assigns, "are made a body politic and corporate under the name of the Concord Railroad Corporation." Laws 1835, Private Acts, c. 1. The stockholders are the corporation. 1 Kyd Corp. 13-18; Mor. Corp., Preface, and s. 227; United States v. Trinidad Coal Co.,137 U.S. 160, 169; State v. Standard Oil Co., 49 Ohio St. 137 177. They hold the entire equitable title and beneficial interest of the property by them put in the corporate trust, and they are the trustee in whom is vested the legal title. Their constitutional rights are not affected by mere incorporation, or by the division of their title into legal and equitable parts. Trustees of Dartmouth College v. Woodward,1 N.H. 111, 115, 116, 120. "There can be no valid distinction between property held in trust and that owned by individuals, in respect to the protection afforded to it by the constitution." People v. O'Brien,111 N.Y. 1, 57. "The corporation, like the individual, is guarded from a despotic exercise of power. Whatever is taken must be paid for." Backus v. Lebanon, 11 N.H. 19, 23. The equal protection of the laws, secured by our bill of rights and by the federal constitution, is not an exclusive privilege of unincorporated persons. Santa Clara County v. Railroad, 118 U.S. 394, 396; Pembina Co. v. Pennsylvania, 125 U.S. 181, 189; Missouri Pacific Railway Co. v. Mackey, 127 U.S. 205, 209; Minneapolis, etc., Railway Co. v. Beckwith, 129 U.S. 26, 28; Charlotte, etc., Railroad Co. v. Gibbes, 142 U.S. 386, 391. The law "places natural persons and corporations precisely upon the same ground" of "liability to legislative control." *Page 631 
"It is the true ground, and the only one upon which equal rights and just liabilities and duties can be fairly based." Thorpe v. Railroad, 27 Vt. 140,145; Stone v. Farmers' L. T. Co., 116 U.S. 307, 329.
The public power of taking private property is limited by the necessity from which it is held to be implied. Kohl v. United States, 91 U.S. 367,371, 373, 374. As it is not necessary to take land for a highway, or to make a public use of other property, without buying it or paying for the use of it, the state cannot forcibly dispossess the owner without indemnifying him. Eminent domain is the power of compelling him to sell. Boston, etc., Co. v. Newman, 12 Pick. 467, 480. The sale includes compensation, which is the payment, not of a large or small portion of the value, but of the whole of it. Sinnickson v. Johnson, 17 N.J. Law 129, 145; Gardner v. Newburgh 2 Johns. Ch. 162, 166-168; Bonaparte v. Railroad, Bald. 205, 220, 221, 226; Hooker v. N. H. N. Co., 14 Conn. 146, 152, 153; Pumpelly v. Green Bay Co., 13 Wall. 166, 178, 179; Monongahela Navigation Co. v. United States, 148 U.S. 312, 324, 325, 327-329, 337, 341-343; Bristol v. New Chester, 3 N.H. 524, 535; Piscataqua Bridge v. N.H. Bridge,7 N.H. 35, 66, 67, 69; Backus v. Lebanon, 11 N.H. 19, 25; Petition of Mt. Washington Road Co., 35 N.H. 134, 142; Great Falls Manf. Co. v. Fernald,47 N.H. 444, 455; Ash v. Cummings, 50 N.H. 591, 612; Eaton v. Railroad,51 N.H. 504, 510, 511; Thompson v. Androscoggin Co., 54 N.H. 545, 557, 558; Orr v. Quimby, 54 N.H. 590, 594, 599; Adden v. Railroad, 55 N.H. 413-415, 418; Thompson v. Androscoggin Co., 58 N.H. 108, 111; Low v. Railroad,63 N.H. 557, 562; 1 Bl. Com. 138, 139; 1 Hare Const. Law 333, 347, 349, 415; Cool. Const. Lim. 691, 697-700.
Compensation is not merely an element of the implied power of coercive purchase: it is parcel of the rights of property and equality which are secured by express guaranties. The bill of rights is a list of rights reserved by the people. By the reservation they limited their grant and exempted themselves, to the stipulated extent, from the authority of the government they created. Wooster v. Plymouth, 62 N.H. 193, 196-203. The reservation is therefore, a controlling definition of "legislative power" in their grant of that power to the senate and house in the second article of the constitution. The right of acquiring property and the rights of life and liberty, which the second article of the bill puts together in a class of rights there described as natural, essential, and inherent, are reserved for all men. Greenville v. Mason, 53 N.H. 515, 518. The first, tenth, twelfth, fourteenth, fifteenth, and twenty-third articles reinforce the second, and establish a general principle of equal right, which governs all by the same rule, and takes from no one more than his share of public expense. State v. Pennoyer, 65 N.H. 113, 114, and authorities there cited. Eminent *Page 632 
domain would not be a legislative power in the sense required by the bill if it trenched upon the right of acquiring and possessing property, or the right of equality. Both rights would be invaded, were land taken for a highway from an unconsenting owner without full indemnity. "To provide a mode by which he shall be recompensed for property justly or unjustly taken from him is to protect his property." Concord Railroad v. Greely,17 N.H. 47, 53. His right is not infringed when he is compelled by due process of law to sell a way for public use. Piscataqua Bridge v. N.H. Bridge, 7 N.H. 35, 71. His share of the public expense, including land damages, is taken by taxation when a common road is built by the public across his land, and when a turnpike or other way, built by him and other stockholders, is bought by the public. More than their shares of a public expense would be taken from them if their road were taken by the public without payment of its value.
It is not necessary, in the present inquiry, to consider an equal distribution of public expense by the tax power, or an exercise of the police power imposing fines and forfeitures as punishment, or destroying property for the prevention of fire, pestilence, or crime. An order to take property from its incorporated or unincorporated owners, without paying them its value and without their consent, for the sole purpose of enriching the state at their expense, would not be legislation. Law "is a rule: not a transient sudden order from a superior to or concerning a particular person; but something permanent, uniform, and universal. Therefore a particular act of the legislature to confiscate the goods of Titius, or to attaint him of high treason, does not enter into the idea of a municipal law; for the operation of this act is spent upon Titius only, and has no relation to the community in general: it is rather a sentence than a law." 1 Bl. Com. 44. The confiscation decree of November 28, 1778, entitled "An act to confiscate the estates of sundry persons therein named," was an exercise of the war power against persons who had, as the preamble alleged, "since the commencement of hostilities between Great Britain and the United States of America, left this and the other United States, and gone over to and joined the enemies thereof." N.H. Laws, ed. of 1789, p. 85; Thompson v. Carr, 5 N.H. 510, 515; Miller v. United States, 11 Wall. 268, 305, 306, 315. It was a law in the sense of being a lawful order issued by men holding all power, legislative and non-legislative, before the adoption of the constitution. Atherton v. Johnson, 2 N.H. 31, 34. It was not a law in the true legal sense explained by Blackstone, and by the reservations of the bill of rights which limit and define legislative power. Such retrospective acts are denounced, in art. 23 of the bill, as highly injurious, oppressive, and unjust. And the understanding that they were repugnant to the rights and liberties reserved in 1784, and were prohibited by the bill, appears in the proviso *Page 633 
qualifying the exception in art. 90 of the constitution. An act of that kind, operating "on the rights or property of only a few individuals without their consent, is a violation of the equality of privileges guaranteed to every subject." Merrill v. Sherburne, 1 N.H. 199, 212.
No one can be "deprived of his property . . . but by the judgment of his peers or the law of the land." Bill of Rights, art. 15. "Law of the land" in this article means due course and process of law. 2 Inst. 46; Cool. Const. Lim. 430. "It is not every act, legislative in form, that is law. Law is something more than mere will exerted as an act of power. It must be not a special rule for a particular person or a particular case, but, in the language of Mr. Webster, in his familiar definition [65 N.H. 613, 614], `the general law, a law which hears before it condemns, which proceeds upon inquiry, and renders judgment only after trial,' so `that every citizen shall hold his life, liberty property, and immunities under the protection of the general rules which govern society,' and thus excluding, as not due process of law, acts of attainder, bills of pains and penalties, acts of confiscation, acts reversing judgments, and acts directly transferring one man's estate to another, legislative judgments and decrees, and other similar special, partial, and arbitrary exertions of power under the forms of legislation." Hurtado v. California, 110 U.S. 516, 535, 536; Ex parte Wall, 107 U.S. 265, 289.
"It must be conceded that there are" private "rights in every free government beyond the control of the state. A government which recognized no such rights, which held the lives, the liberty, and the property of its citizens subject at all times to the absolute disposition and unlimited control of even the most democratic depositary of power, is after all but a despotism. It is true it is a despotism of the many — of the majority, if you choose to call it so — but it is none the less a despotism. It may well be doubted, if a man is to hold all that he is accustomed to call his own, all in which he has placed his happiness, and the security of which is essential to that happiness, under the unlimited dominion of others whether it is not wiser that this power should be exercised by one man than by many. The theory of our governments, state and national, is opposed to the deposit of unlimited power anywhere. The executive, the legislative, and the judicial branches of these governments are all of limited and defined powers." Loan Association v. Topeka, 20 Wall. 655, 662, 663. "Power, when delegated without restrictions, and for the abuse of which the delegate is not held accountable, has a strong tendency toward despotism. The temporary constitution, which we had adopted at the beginning of the war [of 1776], was found by experience to have many imperfections; and the necessity of checks and exclusions became every day more evident." Belk. Hist. N.H., c. 26.
The general assembly that issued the confiscation decree of *Page 634 
1778 "carried on the war against foreign and domestic enemies without a bill of rights, and without any constitutional division or limitation of power. It was a temporary sovereignty, set up to continue during the . . . contest with Great Britain.' 8 N.H. State Papers 2. And its undefined and boundless authority, hastily assumed and arbitrarily exercised, for the transient purpose of the war, does not prove the bounds of the limited government afterwards instituted with deliberation, in a form designed to be permanent, . . . and designed by its limitations to change the provisional and preliminary form because the latter was unlimited. The absolute form, and its precedents so far as they were of the same character, or in any respect repugnant to the new and constitutional system, were swept away together. . . . We had no inviolable rights, no rights constitutional in the American sense, before the second day of June, 1784. The constitution that went into operation on that day terminated the era of unlimited power, and introduced an era of liberty and equality. . . . The non-constitutional system was intentionally abolished, and the system of reserved rights and limited government was intentionally adopted. The reservations could not be more clearly expressed. If the right of equality is not secured by them, it can never be secured by any written instrument. . . . The legal value of the reservations is in their ability, not to suggest or advocate a theory of human rights, but to carry a theory into practical effect, and insure the enjoyment of the rights reserved. . . . `The bill of rights contains the essential principles of the constitution.'" Gould v. Raymond, 59 N.H. 260, 272, 275.
The "supreme executive magistrate," named in art. 41 of the constitution, is distinguished from other executive officers. In art. 40, the supreme court is named as one of several judicial tribunals. In art. 2, a distinction is made between the legislative power of towns, cities, and counties (Brick Presbyterian Church v. Mayor, 5 Cow. 538, 540, 541, Kelley v. Kennard, 60 N.H. 1, 6), and the legislative power vested in the senate and house, and designated as supreme to signify that it is the highest of a law-making character. Confiscation, either total or partial, not being law in the constitutional sense, is not authorized by the supremacy of the senate and house in the field of legislation, or by the supremacy of other branches of government in the interpretation, administration, and execution of law.
Partial confiscation, disregarding the difference between right and wrong, rests on a distinction that cannot be maintained. The confiscation of a part of a farm or railroad by taking the whole and paying less than it is worth, and the confiscation of the whole by taking the whole and paying nothing, are acts of the same legal nature. Eaton v. Railroad, 51 N.H. 504,512. There is no constitutional ground on which an approval of one can be *Page 635 
reconciled with the condemnation of the other. If the owner of property worth $400 can be compelled to sell it to the state for a less sum, the state may elect to pay him $399, or $1. If it can be taken from him on payment of $200, the property in which he invests the $200 can be taken from him for half its value, and the depredation can be repeated with a public profit so long as he has anything worth taking. If he can be deprived of half of his house by a special statute, taking so much without compensation, he can be deprived of his liberty half of the time, or be entirely stripped of property and imprisoned for life, by the same arbitrary method, without trial and without cause. The despotic principle, whether stated in an unlimited or a fractional form, is in conflict with fundamental rights that are now openly and directly attacked for the first time in this state since their safety was assured by the establishment of constitutional government at the close of the Revolutionary War. It is useless to inquire whether, in any other jurisdiction, American or foreign, these rights have never had organic security, or have been deprived of it directly or indirectly, wholly or partially. They would not be overthrown here by proof that there are governments under which they are defenceless. In forming themselves into a state, the people of New Hampshire acted on the belief that insecurity of property would be unfavorable to enterprise, and would tend to discourage industry and economy, which they considered essential to general prosperity. And it is not probable that this was the only reason of their protecting themselves by reservations which render confiscation impossible. There is no evidence that they overlooked the moral aspect of the subject. By the eighty-third article of the constitution they made it a duty to countenance and inculcate the principles of industry, economy, and honesty.
II. The second ground on which partial confiscation was put in argument is the eighteenth section of the Concord charter, which provides that "the legislature may at any time hereafter alter amend, or modify this act or any of its provisions." Short of sheer and absolute (that is, total) confiscation, it was claimed, there is no limit of the power of amendment.
The act of taking the road from its owners was called a resumption. The word "resume" is used in this connection in the books as an allusion to one of the alleged sources of the public right to take private property, whether held in fee or otherwise, and not as a suggestion that the owner's title is exceptionally defeasible. "The complainant held the land in fee, and probably under a title derived from the crown, to the rights of which the people have succeeded. . . . It was no part of the contract between the crown and its grantees or their assigns, that the property should not be taken for public use. . . . All separate interests of individuals in property are held of the government under this tacit agreement or implied reservation. Notwithstanding the grant to *Page 636 
individuals, the eminent domain, the highest and most exact idea of property, remains in the government, or in the aggregate body of the people in their sovereign capacity; and they have a right to resume the possession of the property. . . . This right of resumption may be exercised," etc. Beekman v. Railroad, 3 Paige 45, 72, 73; Bloodgood v. Railroad, 18 Wend. 9, 13; Smith v. Rochester, 92 N.Y. 463, 477. "The true theory . . . is, that the legislature resume dominion over the property." Todd v. Austin,34 Conn. 78, 91. "The right of the public to resume private property for the public use, which has been called the right of eminent domain, is said to be implied in the original social compact." Great Falls Manf. Co. v. Fernald, 47 N.H. 444, 455. Eminent domain "is sometimes spoken of as being based upon an implied reservation by the government when its citizens acquire property from it or under its protection." Cool. Const. Lim. 643. "The private owner of lands acquires only a tenancy of more or less limited duration under the absolute and ultimate proprietorship of the state, . . . subject to certain conditions, one of which is that the state may at any time, on payment of its value, reclaim the tenancy." Tiede. Police Power, s. 121. All owners of property may be called tenants holding under leases from the state, if this feudal description is understood to mean that they are the owners, holding titles either derived originally from the government, or acquired by its permission and under its protection, and subject to be bought by the government without the owner's consent. The public having a power of coercive purchase, and the question being whether the state can confiscate a part of what it buys by not paying for the whole, it is not material whether the true theory and source of the power are indicated when the purchase is described as an appropriation (Charles River Bridge v. W. Bridge, 11 Pet. 420, 641, 642, Boston Lowell Railroad Co. v. Railroad, 2 Gray 1, 35, 36), expropriation (1 Rap. L. Law Dict. 489), assumption (2 Kent, Com. 338, 340), resumption, or reclamation of tenancy.
"According to the feudal theory, all estates were derived from the king. He was called the lord paramount, and in him was vested the absolute right of property. As a return or compensation for the possession and enjoyment of the land, the owners, or, as they were called, vassals, were obligated to render the king certain services, the failure to perform which defeated the estate, and caused it to revert to the lord paramount." Tiede. Real Prop., s. 20. In the English law, title by escheat was one of the consequences of feudal tenure. When the title of the tenant in fee failed, the land reverted to the original grantor, or lord of the fee, from whom it proceeded. "As the feudal tenures do not exist in this country, there are no private persons who succeed to the inheritance by escheat; and the state steps in the place of the feudal lord, by virtue of its sovereignty, as the original and ultimate *Page 637 
proprietor of all the lands within its jurisdiction. . . . When the title to land fails from defect of the heirs or devisees, it necessarily reverts." 4 Kent Com. 423, 424. Under the influence of feudal ideas, it was said that the lands of dissolved corporations reverted. Co. Lit. 13 b; Gray Perp. ss. 44, 48, 51; 1 Bl. Com. 484; 2 Bl. Com. 256; Dill. Mun. Corp. (3d ed.) s. 169; Field Corp., s. 491; Colchester v. Brooke, 7 Q. B. 339, 384; Bacon v. Robertson, 18 How. 480, 483, 487. The charters of several New Hampshire turnpikes (Fourth, Chester, Piermont, and Coos) provide that when the net income of the toll amounts to the sums expended and interest, the roads "shall revert to the state." In such phrases, and when the state is said to resume turnpikes, railroads, or sites for public buildings, which it compels the owners to sell, the words "revert" and "resume" are neither obscure nor misleading. Feudal terms have survived the feudal tenure.
If, by the Concord charter, the state had given the stockholders the right of way and other real estate, and the money and chattels, now belonging to them, and had reserved a right to revoke the gift, the question of retaking that property under the charter could be raised and discussed. But the charter did not give them any of the state's realty, money, or chattels, and an amendment or repeal of the charter cannot revoke a gift that has not been made. Long before the date of the charter, the state, or its predecessor, had parted with the land on which the rails are laid. The stockholders bought the land, or a right of way in it, paid for what they bought, and built the road. This real estate is theirs. No property, private or public, is held, or can be held, by a better title. There is in the state no right of resuming or retaking it that is distinguishable from the right of taking it. Kohl v. United States,91 U.S. 367, 371. If the state once owned the land, its extinguished title is of no more avail than that of any other former owner. If the right of way had been originally taken from the proprietors of the soil, or were now taken from the railroad company, without payment of value, the legality of the act would not depend upon its being called resumption, or trespass and disseisin.
The power of amending charters and the power of repealing them are reserved for a single purpose. "A short reference to the origin of this reservation of the right to repeal charters of corporations may be of service in enabling us to decide upon its office and effect. . . . In Trustees of Dartmouth College v. Woodward (4 Wheat. 518), decided in 1819, this court announced principles on the subject of the protection that the charters of private corporations were entitled to claim under the clause of the federal constitution against impairing the obligation of contracts. . . . The opinion in that case . . . held . . . that the rights and franchises conferred upon private . . . corporations by the legislative acts under which their existence was authorized, and the right to exercise the functions conferred upon *Page 638 
them by the statute, were, when accepted by the corporation, contracts which the state could not impair. It became obvious at once that many acts of incorporation, which had been passed as laws of a public character, partaking in no general sense of a bargain between the states and the corporations which they created, but which yet conferred private rights, were no longer subject to amendment, alteration, or repeal, except by the consent of the corporate body; and that the general control, which the legislatures creating such bodies had previously supposed they had the right to exercise, no longer existed. It was, no doubt, with a view to suggest a method by which the state legislatures could retain, in a large measure, this important power without violating the provision of the federal constitution, that Mr. Justice Story, in his concurring opinion in the Dartmouth College case, suggested that when the legislature was enacting a charter for a corporation, a provision in the statute reserving to the legislature the right to amend or repeal it must be held to be a part of the contract itself, and the subsequent exercise of the right would be in accordance with the contract, and could not, therefore, impair its obligation. . . . It would seem that the states were not slow to avail themselves of this suggestion. . . . This history of the reservation clause in acts of incorporation supports our proposition that whatever right, franchise, or power in the corporation depends for its existence upon the granting clauses of the charter, is lost by its repeal. . . . Whatever power is dependent solely upon the grant of the charter, and which could not be exercised by unincorporated private persons under the general laws of the state, is abrogated by the repeal of the law which granted these special rights. Personal and real property acquired by the corporation during its lawful existence, rights of contract, or choses in action so acquired, and which do not in their nature depend upon the general powers conferred by the charter, are not destroyed by such a repeal; and the courts may, if the legislature does not provide some special remedy, enforce such rights by the means within their power. The rights of the shareholders of such a corporation to their interest in its property are not annihilated by such a repeal, and there must remain in the courts the power to protect those rights." Greenwood v. Freight Co., 105 U.S. 13,19-21; Spring Valley Water Works v. Schottler, 110 U.S. 347, 352, 369, 370.
"Where an act of incorporation is repealed, . . . equity takes charge of all the property and effects which survive the dissolution, and administers them as a trust fund, primarily for the benefit of the creditors. If anything is left it goes to the stockholders." Shields v. Ohio, 95 U.S. 319,324; Farrington v. Tennessee, 95 U.S. 679, 686, 687. "As a private corporation holds its property in trust for the benefit of its stockholders, so a municipality holds its property in trust for beneficiaries whose equitable rights in the trust estate are not created by the incorporation, nor *Page 639 
lost by the dissolution, of the imaginary holder of the legal title. The common law transfers the legal title to a provisional trustee if the employment of such an agent is necessary, settles the business of the defunct corporation, and so disposes of the trust property as to maintain the rights of the equitable owners." School District v. Greenfield,64 N.H. 84, 85; School District v. Concord, 64 N.H. 235. The beneficial ownership of trust funds cannot fail for want of trustees. As vested rights of an equitable character cannot be divested by the death of administrators or other natural persons who hold property in trust, so the equitable title of the stockholders of an incorporated business company cannot be lost by the termination of the trustee's corporate life. The dissolution of the corporate trustee, by the repeal, forfeiture, surrender, or expiration of the charter, does not convey the corporate property to the state, nor enlarge or diminish the constitutional power of the state to become the owner. 2 Kent Com. 307, note b; Folger v. Columbian Ins. Co., 99 Mass. 267,277; Thornton v. Railway, 123 Mass. 32, 34; Burrall v. Railroad,75 N.Y. 211, 216; State v. Bailey, 16 Ind. 46, 52; Mumma v. Potomac Co., 8 Pet. 281; Curran v. Arkansas, 15 How. 304, 310, 312; Bacon v. Robertson, 18 How. 480; Lum v. Robertson, 6 Wall. 277; Broughton v. Pensacola, 93 U.S. 266, 268; Church of Jesus Christ, etc., v. United States, 136 U.S. 1, 47; 150 U.S. 511; — and authorities cited in 59 N.H. 171; Mor. Corp., ss. 1031-1033; Field Corp., s. 491; Dill. Mun. Corp., s. 169; Pierce R. R. 13; Cook Stock., s. 638; Wait Insolv. Corp., ss. 347-349. An amendment of the charter can have no more confiscating effect than a repeal.
The stockholders of a business corporation are partners, with rights and liabilities fixed by the general or special law which is a part of their contract. When their corporate union is dissolved, by repeal of otherwise, there is a tenancy in common, as there is after the dissolution of an unincorporated partnership. 133 U.S. 59; 145 U.S. 356. After three years, allowed for winding up by the use of corporate powers limited to that purpose (G.L., c. 147, s. 17), undivided capital is divisible by agreement of the owners, or by legal process without the exercise of corporate power. "The contention that the property of a dissolved corporation is forfeited, rests wholly upon what is claimed to be the necessary consequence of the extinction of corporate life. We do not think the dissolution of a corporation works any such effect. It would not naturally seem to have any other operation upon its contracts or property rights, than the death of a natural person upon his. . . . It would seem to be quite obvious that a power existing in the legislature by virtue of a reservation only, could not be made the foundation of an authority to do that which is expressly inhibited by the constitution, or afford the basis of a claim to increase jurisdiction over the lives, liberty, or property of citizens beyond the scope of express constitutional power. . . . An express reservation *Page 640 
by the legislature of power to take away or destroy property lawfully acquired or created, would necessarily violate the fundamental law, and it is equally clear that any legislation which authorizes such a result to be accomplished indirectly, would be equally ineffectual and void." People v. O'Brien, 111 N.Y. 1, 47, 48, 51.
"A statute of incorporation is a legislative grant, held by the federal court to be a contract and a creation of private rights, protected in the absence of the reservation by the contract clause of the federal constitution. But calling it a charter, a grant, or a contract does not make it anything more than an exercise of legislative power. A reservation of the right to amend and repeal it is an exercise of the same power, — a legislative retention not of judicial or executive but of legislative power, and not a creation of any power, legislative, judicial, executive, or extra-constitutional. It has the negative effect of preventing the statute of incorporation being exempted by the contract clause from the legislative power of amendment and repeal. . . . Making a charter amendable and repealable like other statutes that are not contracts," it protects "public interests against a contractual abdication of legislative power. . . . The reserved power of amendment and repeal is not anything more than the legislature would have had without a reservation, if statutes of incorporation had been held to be possessed of the ordinary, amendable, and repealable quality of other statutes. With a reservation of that power, an act of incorporation, regarded as a grant, is an alterable and revocable grant, a gift or conveyance of something, a part or the whole of which the grantor can . . . take back or destroy." By "an unlimited reservation of the legislative power of amending and repealing the legislative grant, the state" reserves, "and the corporation by accepting the charter" consents "to the reservation of, the power of taking from the corporation by legislation nothing more than that which, by legislation, the state" has "granted to it. Its existence, derived from the state," can "be terminated by the state. But its" property "cannot be taken away by a revocation of the charter. . . . An amendment of the charter would not be an exercise of a higher constitutional power than would be employed in a repeal of the charter. . . . The law cannot suffer a trust to fail for want of a trustee; for the beneficiaries have a private right in the trust estate, which is as inviolable as property similarly invested without a trustee. If . . . the charter of a railroad corporation were repealed, . . . the corporate property remaining in existence could not be confiscated by a legislative decree, and the right of the stockholders to a distribution of the assets through the agency of a trustee or receiver, or other legal process, could not be denied without a repudiation of constitutional duty. . . . As neither of the branches of government can acquire, by its own act of reservation, any power *Page 641 
exclusively vested by the constitution in either of the others, so neither can acquire, by its own act of reservation, that unlimited power which passed from the British parliament to the provisional government in 1776 and was abolished in 1784. . . . Whatever legislative power was reserved, no power was reserved that is not legislative." Ashuelot Railroad Co. v. Elliot, 58 N.H. 451, 454, 455, 457.
"As congress can exercise legislative power only, all its reservations of power, connected with grants that are made, must necessarily be legislative in their character;" and while the exercise of such power (reserved when its reservation is held to be necessary) may render private property less valuable, it cannot appropriate such property to public use without compensation. Bridge Co. v. United States, 105 U.S. 470, 480, 482. "Congress not only retains, but has given special notice of its intention to retain, full and complete power to make such alterations and amendments of the charter as come within the just scope of legislative power. That this power has a limit no one can doubt. All agree that it cannot be used to take away property already acquired under the operation of the charter." Sinking-Fund Cases, 99 U.S. 700, 720. "Where, under power in a charter, rights have been acquired and become vested, no amendment or alteration of the charter can take away the property or rights which have become vested under a legitimate exercise of the powers granted." Commonwealth v. Essex; Co., 13 Gray 239, 253.
As confiscation is a matter of substance and effect, and not of form or method, the mode of accomplishing it is as immaterial as any name that may be given it. Not being a legislative act in constitutional sense, it is equally ineffectual whether attempted by a repeal or amendment of general or special acts of incorporation (G.L., c. 152), or by the repeal or amendment of the common or statutory law authorizing the organization of voluntary associations, religious societies, and partnerships (G.L., c. 117, 118, 151, 153), or by the repeal or amendment of the common law or statutes regulating the business of any or all unincorporated persons, and the conveyance, inheritance, and use of their homesteads, tools, and stock in trade. All effective statutes are amendments. A statute amending the Concord charter can be nothing but an alteration of some law, either unwritten, or written in the charter or elsewhere. If a legislative power of amendment were a power of confiscation, it could be exercised as well by an alteration of some other law as by an alteration of a charter, and as well against unincorporated as against incorporated persons.
The argument for confiscation by amendment assumes that by the clause which the Dartmouth decision made necessary for the retention of the legislative power of altering the Concord charter, the senate and house altered the constitution, and created and acquired a power that is not legislative. The charter is a statute *Page 642 
which the grant of legislative power in the second article of the state constitution authorizes them to amend. Reserving the power of amendment is merely not parting with it. The retention of power that can exist only within constitutional limits is not an expansion of those limits. The eighteenth section of the charter could have been written in this form: The legislative power of amendment, vested by the constitution in the senate and house, is hereby retained by them, and is hereby extended beyond the constitutional province of legislation, and enlarged into a power of confiscation. — Such an extension clause cannot be implied. If it were implied it would be no stronger than if it were expressed. If it were expressed, it would be void. The act of keeping the amending power does not add a word to the constitution, nor take a word from it, nor change the meaning given to "legislative power" by the bill of rights. It neutralizes the federal decision, that a charter is a contract protected by the federal constitution against impairment by state law. The entire effect of the reservation is to leave this charter unaffected by that federal construction of the federal constitution. It releases the senate and house from the restraint which that construction put upon their law-making capacity. Thus liberated, they can amend the charter by legislation, as they could have amended it without the reservation if the federal constitution had not been adopted, or the federal court had held that an act of mere incorporation is not a contract.
The questions proposed by the house are to be answered as they would have been at an earlier day, when the reservation was not necessary for an exercise of the legislative power of altering the law written in the charter. The question of confiscation by amendment is simplified, and cleared of irrelevant matter, by considering it as of the period between 1784 (when the constitution of New Hampshire took effect) and the subsequent adoption of the constitution of the United States. In July, 1784, the legislature could pass an act of eminent domain under which the owners of land in the Merrimack valley, between Concord and Massachusetts, could be compelled to sell to John Stark a right of way for a railroad to be operated by him, as an unincorporated common carrier, using any kind of motive power. Moor v. Veazie, 32 Me. 343, 355; Hall v. Railroad, 21 Monthly Law Rep. 138, 141; Ash v. Cummings, 50 N.H. 591, 613, 614. He could institute legal proceedings for taking the right of way, and when he paid the land-owners the judicially ascertained amount of their damages, he could lawfully build and work the Concord road. The property which he bought and paid for would be his; the right to be carried by him on the road for a reasonable price would be public. If he had built the road in 1785, and the legislature had enacted in 1786 that his railroad and his farm should become the property of the state when the state paid him nine tenths or one tenth of their value, the confiscation of one tenth or nine tenths of either *Page 643 
piece of property under that act in 1786 would have been a wrong against which he would have had no federal protection. Owings v. Speed, 5 Wheat. 420. There was no federal court in which he could resist it, and no federal ground on which it could be held illegal in this court. As it would have been an attempt to destroy rights of property and equality secured by the New Hampshire bill of rights, it would not have been an exercise of legislative power.
If the supposed statute of 1784 had been a corporate charter as well as an act of eminent domain, and Stark had accepted it and become a corporation, his right of property in his road would have been as inviolable as if he were not incorporated. Had the legislature reserved the power of amendment and repeal, his case would not have been altered. In 1786 the reservation would have been inoperative and useless. Without the reservation, the senate and house could repeal his charter, or amend it to any extent within the bounds of legislation. Neither without the reservation, nor with it, would his road be more liable to total or partial confiscation than his farm. The subsequent adoption of the federal constitution, its prohibition of state laws impairing the obligation of contracts, the federal decision that a charter is a contract protected by that prohibition, and the avoidance of that decision by reservations of the power of charter amendment and charter repeal, did not add a power of confiscation to the legislative power of 1784.
III. The third ground of the claim, that the state can take the Concord road on payment of part of its value, is the seventeenth section of the charter (Laws 1835, Private Acts, c. 1), which provided that the state might purchase the road for a sum to be ascertained by a prescribed computation. This sum might be more, and might be less, than the market value of the road at the time of purchase. The state's right to take the property of corporations under such a provision of general or special law may be called a statutory power, to indicate its origin, and to distinguish it from the power of eminent domain vested in the senate and house by the constitution, which requires the payment of full value for property taken from its owners for public use. The price to be paid under an exercise of the statutory power (for convenience of designation called the statutory price) is unknown. The method of ascertaining it is in controversy. On one side, it is claimed that the statutory power to buy this road still exists, and argument is advanced in support of a computation that would make the price less than the value. On the other side, this power is denied, and it is argued that, if the power existed, the statutory price, in 1889, would have been more than $4,500,000. In the present settled and well known condition of the constitutional power of eminent domain, by which the state can take turnpikes, railroads, and other property, for public use, on payment of value, *Page 644 
a proposition to purchase roads by statutory power would not be made by one who admitted the statutory price to be more than the roads are worth. If that price were agreed to be equal to the value and no more, it would not be material whether the purchase were made by statutory or by constitutional power. The only branch of the present inquiry of any practical importance is, not whether the state can take one kind of property from its owners, paying them what the property is worth, but whether the state can take a part of one kind without payment, by compelling the owners to sell the whole for less than its value. This question was settled by legislative action in 1867.
In the revision of the statutes at that time, it was thought equitable that there should be no discrimination between owners of railroads, and owners of other property that cannot be taken for public use without payment of its value. Railroads might rise, in market value, above the statutory price. If this should happen, not only residents of other states, but also citizens of this state, buying shares of New Hampshire railroads at the market price, might be in no fault for not knowing the property could be taken from them at a lower price. In 1867 such an alleged defect in railroad title was not a matter of common knowledge. There had been no such prospect of New Hampshire roads' being worth more than the statutory price as would attract general attention, or raise an alarm and give warning of danger to savings-banks and other seekers of safe investments. But to the commissioners, and the legislators specially engaged in the work of revision, it was apparent that, at some time, an exercise of the statutory power might be a grievous wrong. It was not believed that the legislature would ever use, or ever desire, a power of despoiling those who could be entrapped by the operation of a law made for a different purpose. So long as it was doubtful whether the turnpikes and railroads of incorporated companies could be taken by eminent domain, some precautionary measure had been considered expedient. For this reason, a right to take them had been made a part of the general law of such roads, — their charters, on this point, being in effect a general law before the general form was adopted in 1844. When, upon repeated decisions, sustained many years by a concurrence of legal opinion, and by uniform practice in taking turnpikes, it had become certain that no other power than eminent domain would be needed for this purpose, the reason for introducing and retaining the statutory power ceased to exist. There was a probability, amounting to a reasonable and moral certainty, that the taking of railroads for less than their value would operate upon some if not all of the owners as oppressively as partial confiscation. In this state of things, upon deliberate consideration they were put upon the legal ground of equal right by striking out of the law the power which long experience had shown was not needed for purposes of justice and good government. *Page 645 
The time and circumstances in which a statute was made, and the history of legislation on the subject, are competent evidence of legislative intent. Preston v. Browder, 1 Wheat. 115, 121, 123; Garland v. Montgomery County, 87 Ala. 223, 225; 130 Ind. 561, 571; 1 Pick. 254, 258; 22 Pick. 531; 2 Gray 28; 9 Allen 75; 14 Allen 478; 127 Mass. 461. The state has been of opinion that more roads were needed than taxpayers could reasonably be compelled to build and keep in repair. And the want has often been supplied by turnpikes, built under charters allowing rights of way to be taken by stockholders who were to receive tolls from travellers in payment of the expense of repairs, and interest on the investment. The object of the charter of the first New Hampshire turnpike, passed in 1796 (Laws 1797, p. 325), is stated in the preamble, which recites that a petition has been presented to the legislature asking a charter for improving the communication between the seacoast and the interior by a direct road from Concord to Piscataqua bridge, and that "the expensiveness of an undertaking of this kind, however useful to the community, would burden the towns through which it may pass so heavily as to render it difficult to effect so important a purpose otherwise than by an incorporated company, who might he indemnified by a toll for the sums that should be expended by them." But the state might grow in population and property, and the time might come when the taxpayers would be able to buy and maintain the road for free use. The question whether eminent domain could compel the stockholders to sell it and their franchise had not been settled. Piscataqua Bridge v. N.H. Bridge, 7 N.H. 35, 66-70; Barber v. Andover, 8 N.H. 398; Peirce v. Somersworth, 10 N.H. 369, 373; Backus v. Lebanon, 11 N.H. 19, 22-25; Northern Railroad v. Railroad, 27 N.H. 183, 193-196; State v. Canterbury,28 N.H. 195, 221, 222; Crosby v. Hanover, 36 N.H. 404, 420; Boston Water Power Co. v. Railroad, 23 Pick. 360, 389-394; Armington v. Barnet,15 Vt. 745; West River Bridge Co. v. Dix, 16 Vt. 446; — and cases cited in Cool. Const. Lim. 647, Lewis Em. Dom., s. 274, and Mills Em. Dom., ss. 41, 42. The grounds on which the power was contested appear in the argument of Backus v. Lebanon, 11 N.H. 19-21, and Boston Water Power Co. v. Railroad, 23 Pick. 360, 367-370, 386, 387. On the federal question whether an exercise of the power would impair the obligation of a contract, decided in 1848, the federal court were not unanimous. West River Bridge Co. v. Dix, 6 How. 507, 537, 549.
When the first turnpike was chartered in 1796, it was not deemed advisable to leave it uncertain whether the public could ever take the road from its owners. To remove the doubt, the owners' consent was inserted in this proviso of the last section of the charter: "Provided, also, That the state of New Hampshire may, at any time after the expiration of forty years from the passing of this act, repay the proprietors of the said road the amount of the sum *Page 646 
expended by them thereon, with twelve per cent. per annum in addition thereto, deducting the amount of toll actually received by the proprietors, and in that case the said road shall, to all intents and purposes, be a public highway, anything in this act to the contrary notwithstanding."
The provision that the road shall be a public highway when the state pays the agreed price is a contract, made by the state on one side, and the stockholders on the other. A stipulation for a price less than their constitutional right under eminent domain, imposed as a condition of a grant of corporate powers, would raise a question of legality that need not now be considered. Assuming the whole contract, in its literal terms, to be valid, both parties are bound by it. A statute impairing its obligation would be retrospective, and within the prohibition of art. 23 of the bill of rights. The consequence of the state's paying a legal price is as obligatory as any other part of the bargain. When the stockholders are paid, "the said road shall, to all intents and purposes, be a public highway, anything in this act to the contrary notwithstanding." The same result was intended by c. 379, Laws 1838 (G. L., c. 67, s. 13), which authorizes the selectmen and courts of common pleas to take any real estate, easement, or franchise of any corporation, "when in their judgment the public good requires a public highway." Under that act, the effect of taking a turnpike is, not that the collection of tolls is continued by the public or its vendee, but that the road is free. "The easement, in which the turnpike corporation had a private interest, but which was devoted to the use of the public, subject to the payment of a toll to the corporation, is taken by the highway for the public use, discharged and exempted from the toll. . . . The easement of the turnpike corporation is purchased by the public in order that the use may be free, instead of being subjected to a burden. It is a substitution of a public right for a right previously existing, partly public and partly private." Peirce v. Somersworth,10 N.H. 369, 373. The legislature empowered the first turnpike company to take land for a toll road that would be public in a certain sense, and to some intents and purposes. Concord Railroad v. Greely, 17 N.H. 47, 57, 59,60, 62; Holt v. Antrim, 64 N.H. 284, 286, 287. When it should become free, it would be public in a broader sense. Then, and not till then, in the meaning of the proviso, it would, "to all intents and purposes, be a public highway, anything in this act [requiring payment of toll] to the contrary notwithstanding."
The expense of land damages, construction, and repairs being considered too heavy to be laid upon taxpayers at the date of the charter, the stockholders were induced to incur that expense by the promise of tolls. When, in the opinion of the legislature, the cost of buying the road and keeping it in repair would not be too heavy a charge to be borne by taxation after a certain time, the *Page 647 
agreement was that the state might abolish the tolls by buying the road. If the parties had agreed that the state instead of relieving travel and trade from the burden of tolls, might buy and sell a right to maintain the burden, there would have been unequivocal evidence of such a design in the written contract. Neither by the contract nor by law could the road be taken from its owners for the purpose of speculation. A taking and sale of it by the state for the profit the state might make by the transaction would not be a public use of it within the law of eminent domain, or a public purpose within the law of taxation. Matter of Albany St., 11 Wend. 149, 151, 152; Matter of John and Cherry Sts., 19 Wend. 659, 677; Embury v. Conner, 3 N.Y. 511, 515, 516; Varick v. Smith, 5 Paige 137, 146-148, 158, 159; Matter of City of Rochester, 137 N.Y. 243, 247; Cooper v. Williams.4 Ohio 253, 284, 285, 288, 290-293 — S.C., 5 Ohio 391, 393; Buckingham v. Smith, 10 Ohio 288, 297; Little Miami Elevator Co. v. Cincinnati,30 Ohio St. 629, 643; Dunn v. Charleston, Harp. 189, 199, 200; Baltimore Ohio Railroad Co. v. Railroad, 17 W. Va. 812, 856; Kane v. Baltimore, 15 Md. 240, 250; Gregg v. Baltimore, 56 Md. 256,272; French v. Quincy, 3 Allen 9, 12, 13; Worden v. New Bedford,131 Mass. 23, 24; Attorney General v. Eau Claire,37 Wis. 400, 435, 437; State v. Eau Claire,40 Wis. 533, 541; Kaukauna Water Power Co. v. Green Bay, etc., Co., 142 U.S. 254, 272-276; Cool. Const. Lim. 648 (note 1), 654, 665; Cool. Tax. 55, 103, 113; Dill. Mun. Corp., ss. 591, 592; Lewis Em. Dom., s. 204; Mills Em. Dom., s. 23; 1 Hare Const. Law 338, 339.
In one respect the power of purchase under the contract was more limited than the constitutional power. If the road were taken under the contract, the tolls would cease; if it were taken by eminent domain, provision could be made for continuing them. In another respect these powers were alike. Under the power reserved in the charter, the road could not be taken for a purpose for which it could not be taken by eminent domain. By the reservation the legislature intended to acquire not a power of speculating in a public burden, but a contractual right to abolish the burden, — a right they might need if the burden could not be abolished by eminent domain. The absence of all schemes of trading on fluctuations in value, and the presence of an intention to remedy the defect that would exist in the law if it should be held that without the reserved right and without the owners' consent toll roads could not be taken for free use, are material facts in the present inquiry. From the beginning to the end of turnpike and railroad legislation on this point there was a continuity of purpose and meaning. In the course of time the purpose may have gradually lost a degree of its original distinctness, as the power of eminent domain came to be less and less a matter of uncertainty. But this change was accompanied by an unchanged practice of using an old charter as a precedent in drafting a new one, without such an *Page 648 
investigation of legal questions as would be made on a general revision of the statutes. When the subject had been dealt with in the railroad law of 1844, the revision of 1867 called for a thorough examination. And the state's right to take railroads by eminent domain being no longer an open question, and the removal of all doubt on that point having accomplished the object of the reserved statutory right to take them, the supernumerary right came to its natural end.
The first railroads that were built in New Hampshire (one chartered in 1833 was not built) were chartered in 1835. In the thirty-nine years next preceding that date, charters for not less than fifty turnpikes had been passed, containing provisos for purchase by the state. These provisos evinced no special desire on the part of the state to own a particular road, but a general policy, such as would appropriately take the form of a general law. There were variations in matters of detail; but so far as a mere right of purchase was concerned, the provisos amounted to a general statute, designed, out of abundant caution, to remedy a certain constitutional defect, if that defect should be found in eminent domain. In a turnpike charter passed January 7, 1853, the legislature stipulate that "the road shall at any time become the property of the state, or may be laid out as a public highway whenever the public good shall require it, on compensation being made to said corporation for their interest therein." Laws 1852 (November session), c. 1360, s. 6. The special significance of this superfluous and inoperative clause is in its date, which was fourteen years after the passage of the act of 1838, and after the practical operation of that act, and the adjudged cases, had demonstrated the useless character of such an enactment of the settled construction of the state and federal constitutions. The clause was harmless, and it was safe to follow the precedents of a former generation.
In other states, similar precaution appears in more recent years. Eighteen constitutions have declared that the power of eminent domain shall not be so construed as to prevent the taking of the property and franchises of corporations. By this declaration, the judicial decisions which had settled the question of construction were adopted and affirmed in Illinois in 1870 (art. 11, s. 14), in West Virginia in 1872 (art. 11, s. 12), in Pennsylvania in 1873 (art. 16, s. 3), in Arkansas in 1874 (art. 17, s. 9), in Alabama (art. 1, s. 24), Missouri (art. 12, s. 4), and Nebraska (art. 11, s. 6), in 1875, in Colorado in 1876 (art. 15, s. 8), in Georgia in 1877 (art. 4, s. 2, par. 2), in California in 1879 (art. 12, s. 8), in North Dakota (s. 134), South Dakota (art. 17, s. 4), Montana (art. 15, s. 9), Washington (art. 12, s. 10), Idaho (art. 11, s. 8), and Wyoming (art. 10, s. 9), in 1889, in Mississippi in 1890 (s. 190), and in Kentucky in 1891 (s. 195). In New Hampshire, the senate and house of 1867 having repealed s. 10 of the act of 1844 (Gen. St. 553) on the ground that the question, which had been *Page 649 
a cause of precautionary legislation, had disappeared, this action was accepted as final. When the constitution was amended in 1877 and 1889, the right of the state to take the property and franchises of corporations by eminent domain was so well understood here that it was not made the subject of a confirmatory amendment.
The Boston Lowell Railroad was chartered in 1830; "so early indeed, and with so little foresight of the actual accommodations as they were afterwards provided and found necessary, that it was rather regarded as an iron turnpike, upon which individuals and transportation companies were to enter and run with their own cars and carriages, paying a toll to the corporation for the use of the road." Boston Lowell Railroad v. Railroad, 2 Gray 1, 28. The owners of the first New Hampshire railroads were turnpike companies as well as common carriers. Smith v. Railroad, 27 N.H. 86, 95; Burke v. Railroad, 61 N.H. 160, 234. Their charters, framed upon turnpike models, abounded in turnpike phrases and turnpike ideas. They contained grants of power to erect toll-houses, establish toll-gates, appoint toll-gatherers, and collect toll, and a turnpike clause which provided that the transportation of persons and property, the construction of wheels, the form of cars and carriages, the weight of loads, and all other matters relating to the use of the roads, should be in conformity to rules and regulations prescribed by the directors. Some contained the further stipulation — "and said road may be used by any person or persons who shall comply with such rules and regulations." In others, this redundant clause was omitted. In some instances, as late as June, 1844 (c. 111, s. 5, c. 112, s. 5), "the times and periods of starting and rates of travel" were unnecessarily added to the specification of matters to be governed by the rules of the company.
"Such corporations, whenever thereto required by the legislature, shall permit all persons to run locomotives and cars on their road, or may be required by the legislature to draw the cars of such persons with the engines of the corporation on said road, subject to such tolls, rules and regulations as the legislature may from time to time prescribe, having due regard to the income of the said road, as heretofore specified, as well as the convenience, safety, and welfare of all concerned; and provided, that when cars and engines are placed by others on the road, such others shall be liable to pay all damages arising from their own default or neglect." Laws 1841 November session), c. 128, s. 15.
This section was intended to be a material change of railroad law. Each of the three railroad charters passed at the June session, 1844 (ss. 5, cc. 111-113), had the usual turnpike clause, which took it for granted that the public easement would include the right not only of stage proprietors and other common carriers of persons and property, but also of all other persons, to place their own cars on the rails for their own use under rules prescribed by *Page 650 
the directors. One of the three (the Great Falls Conway) contained the surplusage — "and said road shall be used by any person or persons who shall comply with such rules and regulations." In the seven railroad charters passed at the November session in the same year — c. 188 (approved Dec. 24), cc. 189, 190, 191, 192, and 193 (approved Dec. 27), and c. 194 (approved Dec. 28) — the turnpike clause was omitted. Section 15 of c. 128 (approved Dec. 25) being a general law applicable to all railroads, its reenactment in laws called special and private was unnecessary. If it had been repeated in charters subsequently passed, its repetition would have been as inoperative as s. 9 of c. 549, Laws 1847, s. 8 of c. 661, Laws 1848, and s. 7 of c. 4317, Laws 1866, which were evidently copied from old forms in drafting bills, the futility of those sections being overlooked. Section 15 of the act of 1844 was a revision of the law of the whole subject to which it related, and took the place of charter provisions which had been in effect, a general law on the same subject. By c. 39, Laws 1843, the provision of the Concord charter, that "said road may be used by any person or persons who shall comply with such rules and regulations," had been repealed. Section 15 of the act of 1844 put all railroads on the footing of equal right and equal obligation by suspending the public right (so far as it existed) of using them as turnpikes, and providing that "such corporations" should "permit all persons to run locomotives and cars on their road" "whenever thereto required by the legislature." Sections 10, 11, 12, 13, 14, 15, 16, 17, 18, 19, and 20 were evidently intended to be a system of uniform law applicable to all railroads.
The effect of those sections, and the effect of the repeal of s. 10, are determined by settled principles of construction. "In the case of all written laws, it is the intent of the lawgiver that is to be enforced." Cool. Const. Lim. 69. "The intention of the legislature must govern; and in this intention a literal construction of any statute must yield." Church v. Crocker, 3 Mass. 17, 21; Mendon v. Worcester County, 10 Pick. 235, 243; Commonwealth v. Cambridge, 20 Pick. 267, 271, 272; Stone v. Hill,72 Tex. 540, 543; Suth. Stat. Cons., s. 246. "Every interpretation that leads to an absurdity ought to be rejected. . . . As it cannot be presumed that any one desires what is absurd, it cannot be supposed that he who speaks has intended that his words should be understood in a manner from which an absurdity follows. . . . The rule we have just mentioned is absolutely necessary, and ought to be followed even when there is neither obscurity nor anything equivocal in the discourse, the text of the law, or the treaty itself. For it must be observed that the uncertainty of the sense that ought to be given to a law or a treaty does not merely proceed from the obscurity, or any other fault in the expression; but also from the narrow limits of the human mind, which cannot foresee *Page 651 
all cases and circumstances, or include all the consequences of what is appointed or promised: and in short, from the impossibility of entering into this immense detail. We can only make laws or treaties in a general manner, and the interpretation ought to apply them to particular cases conformably to the intention of the legislature or of the contracting powers. Now it cannot be presumed that in any case they would lead to anything absurd: therefore if their expressions, taken in their proper and ordinary sense, lead to it, it is necessary to turn them from that sense just so far as is sufficient to avoid absurdity." Vatt., b. 2, c. 17, s. 282.
"With respect to the written contracts of parties, and the wills of testators, we must endeavor to construe them as well as we can; and if one construction leads to manifest absurdity, and a different construction leads to a sensible result, we are at liberty to reject the construction which leads to the absurdity. . . . But I do not think we are at liberty to use the same freedom with the statutes of the realm." Pollock, C. B., in Miller v. Salomons, 7 Ex. 475, 560. The reason given for this distinction is, that written contracts and wills cannot be explained by their makers, and that statutes can be amended by the legislature. The reason is irrelevant, and the distinction groundless. Contracts, wills, and statutes are the makers' intentions, proved by competent evidence. Cole v. Lake Co.,54 N.H. 242, 287; Houghton v. Pattee, 58 N.H. 326; Morse v. Morse,58 N.H. 391; Hurd v. Dunsmore, 63 N.H. 171; Crawford v. Parsons,63 N.H. 438; Johnson v. Conant, 64 N.H. 109, 136; Mobile Montgomery Railway Co. v. Jurey, 111 U.S. 584, 592; Edgerly v. Barker, ante, 434, 447; Commonwealth v. Railroad, 3 Cush. 25, 43; Risley v. Bank, 83 N.Y. 318,336; Boody v. Watson, 64 N.H. 162, 189. Whether a writing is a contract or a law, or both (13 How. 71, 81, 86), its meaning is ascertained by a due consideration of legal proof. Courts cannot reject such proof, or impute to legislators an improbable purpose in the performance of their public duty of making laws, that would not be imputed to them in the exercise of their private right of making contracts and wills. If a statute is capable of two meanings, and one is more reasonable and therefore more probable than the other, this fact is necessarily considered, with all other competent evidence, on the question of intent. The evidence of intention may include various inherent probabilities and the probative force of many circumstances, as well as the literal sense of the words used. When the meaning is found by giving due weight to everything that legally tends to prove it, it is not a matter of discretion whether it shall be adopted or rejected. If the evidence establishes the fact that the literal sense is not the true sense, a literal construction would be an alteration of the law.
"It is not the words of the law," says Plowden, "but the internal sense of it that makes the law. . . . It often happens *Page 652 
that when you know the letter, you know not the sense, for sometimes the sense is more confined and contracted than the letter, and sometimes it is more large and extensive. . . . When an act of parliament ordains that whoever does such an act shall be a felon, and shall suffer death, yet if a man of unsound mind, or an infant of tender age who has no discretion, does the act, they shall not be felons, nor shall they be put to death. And if a statute be made that all persons who shall receive or give meat or drink or other aid to him that shall do such an act (knowing the same to be done) shall be accessaries to the offence, and shall be put to death, yet if a man commits the act, and comes to his own wife, who knowing the same receives him and gives him meat and drink, she shall not be accessary to his offence, nor a felon, for one that is of unsound mind, an infant, or a wife, were not intended to be included in the general words of the law. So that in these cases the general words of the law are corrected and abridged by equity. . . . When the words of a statute enact one thing, they enact all other things which are in the like degree. As the statute which ordains that in an action of debt against executors he who comes first by distress shall answer, is extended by equity to administrators, and such of them as comes first by distress shall answer by the equity of the said statute, quia sunt in aequali genere. And the act of 4 H. 4, cap. 8, gives a special assize to him who is disseized and ousted of his land by force against the disseizor, and enacts that he shall recover against him double damages; and in the book of entries, fo. 406, it appears that the plaintiff recovered by judgment double damages in an assize of nusance for turning a water-course with force, to the nusance of his mills, wherein it was found for the plaintiff, and yet there he was not ousted of his land, nor did he suffer any disseizin, but only a nusance to the damage of his freehold, viz., of his mills, whereof he continued seized: so that by the equity of the said statute the plaintiff recovered his double damages for the nusance, because it is in like degree with a disseizin of land. And the statute of Gloucester gives an action of wast . . . against him that holds for life or for years, and by the equity thereof a man shall have an action of wast against him who holds but for a year, or for twenty weeks, and yet this is out of the words of the act, for he that holds but for one year does not hold for years, but it is within the intent of the act, and the words which enact the one do by equity enact the other. And so there are an infinite number of cases in our law which are in equal degree with others provided for by statutes, and are taken by equity within the meaning of those statutes. . . . The intent (which is the only thing regarded by equity . . .) ought to be followed and taken for law." Eyston v. Studd, Plow. 459, 465, 467, 468; Stowel v. Zouch, Plow. 353 a, 366; Arthur v. Bokenham, 11 Mod. 148, 161. *Page 653 
"Also there be divers other estates in tail though they be not by express words specified in the said statute [W. 2], but they are taken by the equity of the same statute." Lit. Ten., s. 21. "The cases of the statute are set down but for examples of estates tail, general and special, and not to exclude other estates tail. . . . `Equity' is a construction made by the judges, that cases out of the letter of the statute, yet being within the same mischief, or cause of the making of the same, shall be within the same remedy that the statute provideth: and the reason hereof is, for that the law-makers could not possibly set down all cases in express terms." Co. Lit. 24. "Equity rather followeth the intent of the law than the words of the law." Doct. St., Dial. 1, c. 16. "As for construing the statute by equity, equity is synonymous to the meaning of the legislator." Rex v. Williams, 1 W. Bl. 93, 95; End. Interp. Stat., ss. 320, 321.
"The judges of the law in all times past have so far pursued the intent of the makers of statutes, that they have expounded acts, which were general in words, to be but particular where the intent was particular. . . . Those statutes which comprehend all things in the letter, they have expounded to extend but to some things, . . . and those which include every person in the letter, they have adjudged to reach to some persons only, which expositions have always been founded upon the intent of the legislature, which they have collected sometimes by considering the cause and necessity of making the act, sometimes by comparing one part of the act with another, and sometimes by foreign circumstances. So that they have ever been guided by the intent of the legislature." Stradling v. Morgan, Plow. 199, 203-205. "The real intention, when accurately ascertained, will always prevail over the literal sense of terms. When the expression in a statute is special or particular, but the reason is general, the expression should be deemed general." 1 Kent Com. 462; Beawfage's Case, 10 Co. 99 b. It is "an old and unshaken rule in the construction of statutes" "that the intention of a remedial statute will always prevail over the literal sense of its terms, and therefore when the expression is special or particular, but the reason is general, the expression should be deemed general." Brown v. Pendergast, 7 Allen 427, 429. "It is by no means unusual in construing a statute to extend the enacting words beyond their natural import and effect, in order to include cases within the same mischief, where the statute is remedial. It is a mode of construction as familiar to every legal person as expounding the statute by equity." Dean v. Middleburgh, 2 Y. J. 196, 215; Com. Dig., Parliament (R 13), (R 15), (R 16).
"The defendants have argued," says Camden, C.J., delivering the judgment of the court in Entick v. Carrington (19 St. Tr. 1029, 1044, 1060, 1061), "upon two rules of construction, which in truth are but one. First, where in a general act a particular *Page 654 
is put as an example, all other persons of like description shall be comprized. Secondly, where the words of a statute enact a thing, it enacts all other things in like degree. In Plowden 37, and 167, and 467, several cases are cited as authorities under these rules of construction; as, that the bishop of Norwich in one act shall mean all bishops; that the warden of the Fleet shall mean all gaolers; that justices of a division mean all justices of the county at large, that guardian in socage after the heir's attaining fourteen, shall be a bailiff in account; that executors shall include administrators, and tenant for years a tenant for one year or any less time; with several other instances to the like purpose. . . . Though the general rule be true enough, that where it is clear the person or thing expressed is put by way of example, the judges must fill up the catalogue; yet we ought to be sure, from the words and meaning of the act itself, that the thing or person is really inserted as an example. This is a very inaccurate way of penning a law; and the instances of this sort are scarce ever to be found, except in some of the old acts of parliament. . . . In all cases that fall within this rule [that where the words of a statute enact a thing, it enacts all other things in like degree] there must be a perfect resemblance between the persons or things expressed and those implied. Thus for instance, administrators are the same thing with executors; tenant for half a year and tenant for years have both terms for a chattel interest, differing only in the duration of the term; and so of the rest, which I need not repeat one by one: and in all these cases, the persons or things to be implied are in all respects the objects of the law as much as those expressed. . . . The law must not be bent by the construction, but that must be adapted to the spirit and sense of the law. The fundamental rule then, by which all others are to be tried, is laid down in Wimbish and Tailbois, Plowden 57, 58, according to which the best guide is to follow the intent of the statutes. Again, according to Plowden, pp. 205 and 231, the construction is to be collected out of the words according to the true intent and meaning of the act, and the intent of the makers may be collected from the cause or necessity of making the act, or by foreign circumstances."
"There is an essential difference between the expounding modern and ancient acts of parliament. In early times, the legislature used (and I believe it was a wise course to take) to pass laws in general and in few terms; they were left to the courts of law to be construed so as to reach all the cases within the mischief to be remedied. But in modern times great care has been taken to mention the particular cases in the contemplation of the legislature, and therefore the courts are not permitted to take the same liberty in construing them as they did in expounding the ancient statutes." Buller, J., in Bradley v. Clark, 5 T. R. 197, 201, 202; Wilson v. Knubley, 7 East 128, 134, 186; Lord Brougham *Page 655 
in Gwynne v. Burnell, 6 Bing. N.C. 453, 561; Bac. Abr., Statute I, 6; End. Interp. Stat., ss. 322-325. The precision and skill, or the want of them, apparent in the draft of any laws, ancient or modern, and the brief and general or the elaborate and specific character of writings of any date, are facts to be considered on the question whether their meaning is fully and exactly given by a literal version. "The fundamental principles of government found in constitutions must necessarily be declared in terms very general, because they must be very comprehensive." Miller, J., in Woodson v. Murdock, 22 Wall. 351, 381. As such an instrument does not go minutely into particulars, it would sometimes be easy to defeat a provision by a narrow reading, or by the application of arbitrary rules. Cool. Const. Lim. 75, 101. Now, as in former times, a statute, concisely expressed, may be ambiguous. The true method of ascertaining its meaning cannot become obsolete. What is within the legally proved intention of the legislature is within the statute, though not within the letter; and what is within the letter but not within the intention is not within the statute. This tenor of the ancient rule has not been abandoned. While some of the old cases on this and other subjects are, for various reasons, of little or no value at the present time, the general doctrine of construction is unchangeable.
An English statute (1 W. 4, c. 70, s. 27), abolishing certain courts, provided "that the Court of Common Pleas shall have the like power and authority to amend the records of fines and recoveries passed heretofore in any of the courts abolished by this act, as if the same had been levied, suffered, or had in the Court of Common Pleas." In Evans v. Griffith (9 Bing. 311-313, 316), the defendant contended that "amend" did not mean "create," and that the act did not authorize the court to make a new and entire record. In the opinion, the court say, "The enactment . . . may be well understood as a power to enter up the whole record where the materials are found upon the files of the court; to make a good record altogether; and not to be confined to the amending of a faulty record, or the completing of a record where a formal incipitur only has been put upon the plea roll. Many instances occur in the books, of a similar construction of statutes. The 9 Rich. 2, c. 3, gives a writ of error to him in reversion, if a tenant for life lose in a praecipe; but it was resolved that though the statute speaks only of reversions, yet remainders are also taken to be within the purview thereof. Winchester's Case, 3 Co. 4. The action of debt for an escape, which lies against every sheriff and gaoler where the prisoner escapes out of execution, is grounded upon the statute 1 Rich. 2, c. 12, which is altogether silent about sheriffs and gaolers, and mentions only the Warden of the Fleet. So the statute of . . . 13 Edw. 1, which mentions only the Bishop of Norwich, has been always extended to include all other bishops. 2 Inst. 487. The *Page 656 
statute of Westminster 1 gives a remedy where `outrageous toll is taken.' By construction of law, that remedy applies either where a reasonable toll is due, and excessive toll is taken, or where no toll at all is due, and yet toll is unjustly usurped. 2 Inst. 220. In these, and many other instances, the particular expression used in the statute is looked upon only as an example of other cases lying within the same mischief, and therefore calling for the same remedy." In Jones v. Harraden, 9 Mass. 540, note 3, it was held that an action of account, given as a remedy by 4 Anne, c. 16, "ought to be considered as put by way of example, not of limitation." Of a statute literally applicable to no place but London, Coke says, — "Here the city of London is named, but it appeareth by that which hath been said out of Fleta, that this act extends to such cities and boroughs privileged, that is, such as have such privilege to hold plea as London hath." 2 Inst. 322.
"The language of the statute [7 8 Vict., c. 101] applies in terms only to single women: so did the language of stat. 6 G. 2, c. 31; yet Lord Ellenborough and the whole court, in Rex v. Luffe [8 East 193], held that an order might be made on the putative father of the bastard child of a married woman, who was to be considered single under the existing circumstances and for that purpose. . . . The law, differently interpreted, would fail to reach a very large proportion of illegitimate children." Regina v. Collingwood, 12 Q. B. 681, 686, 687. "It would be strange if one class of bastards, though small, were left entirely destitute, and there were no liability in the putative father." Regina v. Pilkington, 2 E. B. 546, 553. In Silver v. Ladd, 7 Wall. 219, an unmarried woman was held to be "a single man," within the meaning of an act of congress granting public land to settlers in Oregon. In Ragland v. Justices, 10 Ga. 65, 70, 71, "looking to the subject-matter of the law," and "the reason and object of the law," the court held that a statute relating to "any guardian, executor, or administrator, chargeable with the estate of any orphan," included minors whose parents were living. "The bond of a county treasurer, he being peculiarly an officer of the county as distinguishable from an officer of the state, payable to the county and not to the state, . . . may not be within the words of" a statute concerning the "breach of any official bond or undertaking of any officer of this state," "if they are taken in a narrow or a strict sense." But it was held to he within the statute. Morrow v. Wood, 56 Ala. 1, 5. Under a statute exempting carts carrying manure from the payment of turnpike toll, it was held that empty carts going to fetch manure were exempt. This construction was opposed on the ground that "the exemption can go no further than the express letter, and it cannot be extended by equity." Harrison v. James, 2 Chit. 547. Floating lumber "across" the waters of a river, may include floating it down the river. Bennett's Appeal, 65 Pa. St. 242, 251. "The second article of the by-laws *Page 657 
[of a corporation], that any person chosen a director should cease to be one when he ceased to be a proprietor, if construed according to its precise language, would not prohibit the election of a person who was not a proprietor. . . . But this was not probably the construction intended. There is nothing in the proceedings of the company to show that we ought to give this clause such a strict interpretation, and it may well be construed to render any one who was not a proprietor ineligible." Despatch Line v. Bellamy Co., 12 N.H. 205, 222. The duty of so constructing a railroad as not to obstruct the safe use of private ways, requires the company to maintain as well as to construct safe crossings. Keefe v. Railroad,63 N.H. 271.
"Such construction ought to be put upon a statute as may best answer the intention which the makers had in view. . . . The intention . . . is sometimes to be collected from the cause or necessity of making a statute; at other times from other circumstances. Whenever this can be discovered, it ought to be followed with reason and discretion in the construction of the statute, although such construction seem contrary to the letter of the statute. . . . A thing which is within the intention of the makers of a statute is as much within the statute as if it were within the letter. . . . A thing which is within the letter of a statute is not within the statute, unless it be within the intention of the makers." Bac. Abr., Statute (I), 5, and authorities there cited; People v. Utica Insurance Co., 15 Johns. 358, 380, 381; Riggs v. Palmer, 115 N.Y. 506, 509-511; State v. Boyd, 2 G. J. 365, 374; Chesapeake Canal Co. v. Railroad, 4 G. J. 1, 152; Baltimore v. Root, 8 Md. 95, 105; New England Car Spring Co. v. Railroad, 11 Md. 81, 90; Oates v. Bank, 100 U.S. 239, 244. "A rigid and literal reading would in many cases defeat the very object of the statute. . . . Every statute ought to be expounded, not according to the letter, but according to the meaning. . . . And the intention is to govern, although such construction may not in all respects agree with the letter of the statute. The reason and object of a statute are a clue to its meaning, and the spirit of the law and the intentions of its makers are diligently to be sought after, and the letter must bend to these." Tracy v. Railroad,38 N.Y. 432, 437; Rutledge v. Crawford, 91 Cal. 526; 533.
In Ryegate v. Wardsboro, 80 Vt. 746, the town of W. recovered a judgment against the town of R. for money expended by W. in the support of W.'s pauper. "This singular result," say the court, "inevitably follows from a literal construction of the statute. Hence the question arises, Are we at liberty, when the words of the statute are plain and unambiguous, but are directly repugnant to the whole spirit and intent of all our legislation on the same subject and in the same act, and seem to involve an absurdity, to disregard the letter of the law, and attach to it that meaning *Page 658 
which the legislature really intended? . . . The letter of the law is found by experience not to be in all cases a correct guide to the true sense of the lawgiver. Hence have arisen those rules for the construction of statutes which look to the whole and every part of a statute and the apparent intention derived from the whole, to the subject-matter, to the effects and consequences, and to the reason and spirit of the law, and thus ascertain the true meaning of the legislature, though the meaning so ascertained conflict with the literal sense of the words. . . . Illustrations and authorities are unnecessary to sustain a principle so well settled. We may, however, refer to one derived from an old book, which, in its treatise on this subject, Judge Story calls `an excellent summary of the rules for construing statutes,' and which, for its sense and point, is worthy of attention. `In some cases, the letter of an act of parliament is restrained by an equitable construction; in others it is enlarged; in others the construction is contrary to the letter. In order to form a right judgment whether a case be within the equity of a statute, it is a good way to suppose the law-maker present; and that you have asked him this question: Did you intend to comprehend this case? Then you must give yourself such answer as you imagine he, being an upright and reasonable man, would have given. If this be that he did mean to comprehend it, you may safely hold the case to be within the equity of the statutes; for while you do no more than he would have done, you do not act contrary to the statute, but in conformity thereto.' [Plow. 467, 467 a.] Applying this rule to the case at bar; we think all must agree that if the lawmaker were present, and so interrogated, he would answer that he did not intend to comprehend it within this statute. . . . It is clear to us that the true meaning of the statute cannot be reconciled with the literal meaning of the words. In such case the letter of the law must yield to its spirit and intent." The judgment recovered against R. by W. for money expended by W. in supporting W.'s pauper was reversed upon legal evidence that the literal construction did not correctly express the legislative intent. The proposition, that an interpreter of a statute is to imagine what answer would be given by upright and reasonable legislators to the question of their intent (64 Vt. 201 115 N.Y. 510) is one of several modes of stating the question of probability, and presenting the idea that the legal meaning is a fact to be found by a reasonable inference from the letter and all other competent evidence tending to prove the sense in which the legislature used the language of the act.
"Statutes are to be construed with reference to the objects to be accomplished by them and with reference to the circumstances existing at the time of their passage and the necessity for their enactment. Where a statute would operate unjustly or absurd consequences would result from a literal interpretation of terms *Page 659 
and words used, the intention of the framers, if it can be fairly gathered from the whole act, will prevail." Murray v. Hobson, 10 Col. 66, 73. "Where any particular construction which is give to an act leads to gross injustice or absurdity, it may generally be said that there is fault in the construction, and that such an end was never intended or suspected by the framers of the act." Peckham, J., in People v. Onondaga Co., 129 N.Y. 395,445. "Nothing is better settled than that statutes should receive a sensible construction, such as will effectuate the legislative intention, and if possible so as to avoid all unjust or an absurd conclusion." Lau Ow Bew v. United States, 144 U.S. 47, 59-62; Pollock, C. B., in Hutchinson v. Railway, 15 M. W. 314, 318; End. Interp. Stat., c. 9.
"All laws should receive a sensible construction. General terms should be so limited in their application as not to lead to injustice, oppression, or an absurd consequence. It will always therefore be presumed that the legislature intended exceptions to its language, which would avoid results of this character. The reason of the law in such cases should prevail over its letter. The common sense of man approves the judgment mentioned by Puffendorf, that the Bolognian law which enacted `that whoever drew blood in the streets should be punished with the utmost severity,' did not extend to the surgeon who opened the vein of a person that fell down in the street in a fit. The same common sense accepts the ruling, cited by Plowden, that the statute of 1st Edward II, which enacts that a prisoner who breaks prison shall be guilty of felony, does not extend to a prisoner who breaks out when the prison is on fire — `for he is not to be hanged because he would not stay to be burnt.' And we think that a like common sense will sanction the ruling we make, that the act of congress which punishes the obstruction or retarding of the passage of the mail, or of its carrier, does not apply to a case of temporary detention of the mail caused by the arrest of the carrier upon an indictment for murder." United States v. Kirby, 7 Wall. 482, 486, 487. "Where any particular construction would lead to an absurd consequence, it will be presumed that some exception or qualification was intended by the legislature, to avoid such conclusion." Commonwealth v. Kimball; 24 Pick. 366, 370; 1 Bl. Com. 91; 41 N.H. 555.
"It is a canon of interpretation to so construe a law or a treaty as to give effect to the object designed, and for that purpose all of its provisions must be examined in the light of attendant and surrounding circumstances. To some terms and expressions a literal meaning will be given, and to others a larger and more extended one. The reports of adjudged cases and approved legal treatises are full of illustrations of the application of this rule. The inquiry in all such cases is as to what was intended in the law by the legislature, and in the treaty by the contracting parties. In Geofroy v. Riggs, 133 U.S. 258, . . . it was held that the *Page 660 
District of Columbia . . . is one of `the states of the Union,' within the meaning of that term as used in the consular convention of 1853 with France. . . . A statute of Henry VIII enacted that if anybody should rob or take `the goods of the king's subjects within this realm,' and be found guilty, the party robbed should have restitution of the goods. Of this statute Sir Matthew Hale said that `though it speaks of the king's subjects, it extends to aliens.'" In re Ross, 140 U.S. 453, 475, 476. In that case it was held (p. 479) that a British subject, being one of the crew of an American vessel, is a citizen of the United States within the meaning of U.S. Rev. St., ss. 4083-4087, which authorize American consuls to arrest and try "citizens of the United States" charged with crime committed in certain foreign countries.
The first section of a federal statute (Feb. 26, 1885, c. 164) makes it unlawful to assist or encourage the immigration of a foreigner "under contract . . . to perform labor or service of any kind" in this country. The fifth section provides that the act shall not apply to foreigners temporarily residing here; to the importation of skilled workmen for any new industry when skilled labor cannot otherwise be obtained; "to professional actors, artists, lecturers, or singers, nor to persons employed strictly as personal or domestic servants;" or to a person assisting a member of his family, or any relative or personal friend, to migrate for the purpose of settlement here. The corporation of Trinity church made a contract with a foreigner to come from England to New York and enter the service of the church as rector and pastor. The contract was performed, and an action was brought against the church to recover the penalty prescribed by the statute. "It must be conceded that the act of the corporation is within the letter of" the first "section, for the relation of rector to his church is one of service, and implies labor on the one side with compensation on the other. Not only are the general words labor and service both used, but also, as it were to guard against any narrow interpretation and emphasize a breadth of meaning, to them is added `of any kind'; and, further, . . . the fifth section which makes specific exceptions, among them professional actors, artists, lecturers, singers, and domestic servants, strengthens the idea that every other kind of labor and service was intended to be reached by the first section." But assisting and encouraging the immigration of foreigners under contract to perform, in this country, the labor and service of clergymen or teachers, although within the letter of the law, was not within the evil which congress intended to remedy, and therefore was not prohibited by the true construction. Church of the Holy Trinity v. United States, 143 U.S. 457. The evil at which the statute was aimed is evidence of its meaning (Co. Lit. 381, b, 1 Bl. Com. 87), and may be looked for in the public history of the time. Aldridge v. Williams, 3 How. 9, 24; United States v. Railroad,91 U.S. 72, 79; *Page 661 
Rich v. Flanders, 39 N.H. 304, 311, 312. Due weight being given to this evidence, one kind of labor and service is an exception, not included in the general expression "labor or service of any kind;" and the special and particular expression "professional actors, artists, lecturers, or singers," is not a complete enumeration, but an example, of the class of persons covered by the exception. The general expression has a narrower meaning, and the particular expression has a broader meaning, than would be found by literal construction.
"The language of a statute is not to be construed according to technical rules, unless such be the apparent meaning of the legislature. Therefore many cases, not expressly named, may be comprehended within the equity of a statute; the letter of which may be enlarged or restrained, according to the true intent of the makers of the law." Whitney v. Whitney, 14 Mass. 88,92, 93. "In some cases, the letter of the statute may be restrained by an equitable construction; in others, enlarged; and sometimes the construction may be even contrary to the letter." Pierce v. Emery, 32 N.H. 484, 508; Bac. Abr. (I) 6; 99 N.Y. 49; 8 N.H. 574; 44 N.H. 405; 7 Mass. 524-526;103 U.S. 694; 1 Me. 93; 61 N.H. 423, 424, 429;62 N.H. 193, 202; 63 N.H. 528, 530; 1 Edw. Ch. 273, 277. "Instances without number exist where the meaning of words in a statute has been enlarged, or restricted and qualified, to carry out the intention of the legislature. The inquiry, where any uncertainty exists, always is as to what the legislature intended, and when that is ascertained it controls." Eureka, etc., Mining Co. v. Richmond Mining Co., 4 Saw. 302, 316, 317. "There is probably no jurisdiction in which a legislative purpose is carried into effect by a more liberal mode of construction than that which prevails in this state. But the most liberal construction is nothing more than the ascertainment of that purpose from competent evidence." Boston, Concord Montreal Railroad v. Railroad, 65 N.H. 393, 399.
"An intention to supersede local and special acts may . . . be gathered from the design of an act to regulate, by one general system or provision, the entire subject-matter thereof, and to substitute for a number of detached and varying enactments, one universal and uniform rule applicable throughout the state." End. Interp. Stat., s. 231. "Special or local laws will be repealed by general laws when the intention to do so is manifest, as where the latter are intended to establish uniform rules for the whole state." Suth. Stat. Const., s. 159.
Derby v. Bury Imp. Com'rs, L. R. 3 Ex. 121 — S.C., L. R. 4 Ex. 222 — was an action for constructing a sewer across the plaintiff's land in the town of Bury. A local act of 1846, relating to that town, authorized such work to be done by the defendants after notice and opportunity for a hearing. A general act of 1855 on the same *Page 662 
subject contained no provision in relation to notice. No notice was given by the defendants. "A general act," says Martin, B. (L. R. 3 Ex. 134), "relating to the sewage of towns, expressed to apply to the whole of England, and in no way referring to local acts, is to be construed according to the ordinary and natural meaning of the words used, and is not to be restricted or affected by local acts. If the contrary view be correct, the inevitable consequence will be, that instead of the general act operating uniformly and consistently throughout the kingdom, there will, as regards different towns, be so many different constructions as there are different local acts varying in their provisions relating to sewers." The act of 1855 was "expressed to apply to the whole of England" by the use of ordinary terms of general legislation. In the Exchequer Chamber, the court say (L. R. 4 Ex. 226), "Many cases were cited to show that special privileges conferred by statute upon individuals, or special constitutions imposed upon limited bodies, are not to be considered as repealed by subsequent general legislation not expressly or by necessary inference inconsistent with the former. Those authorities are only so many illustrations of the rule generalia specialibus non derogant. They are inapplicable to the present case, where the local act conferred upon the commissioners a power conditional upon giving notice, and the general act gives power to all such bodies to do the same thing without such notice."
A special act providing how prisoners of certain boroughs should be maintained in a jail of Essex county, was held to have been repealed by a general law in which the special act was not mentioned. Bramston v. Colchester, 6 E. B. 246. "In all cases," says Campbell, C.J. (p. 251), "the statute must be construed according to what appears to be the intention of the legislature." The ground of the decision (p. 253) is, that "it appears to have been the intention of the legislature to sweep away all local peculiarities, though sanctioned by special acts, and to establish one uniform system, except in so far as there are express exceptions." In Rex v. Northleach Witney Roads, 5 B. Ad. 978, the provisions of a local turnpike act concerning the inspection of books, were held to be superseded by a general turnpike act which expressly declared the importance of a uniform system of turnpike law. "Otherwise," says Denman, C.J. (p. 981), "the very evil would ensue which that act was intended to prevent, namely, the want of uniformity in the laws regulating turnpike roads throughout the kingdom." Without the express clause on the importance of a uniform system, and without a provision that special or local laws shall remain in force (G.L., c. 44, s. 13), in the construction of such an act in this state there would be a presumption in favor of an intention to establish uniformity.
In 1855, a general law (c. 1662, s. 6) provided that "No policy issued by any insurance company . . . shall be void by reason *Page 663 
of any error, mistake, or misrepresentation, unless it shall appear to have been intentionally and fraudulently made." In 1862, an amendment of the charter of an insurance company provided that any policy of insurance issued by that company shall be valid "in all cases where the assured has a title in fee-simple, unincumbered, to the building, buildings, or property insured, and to the land covered by said buildings; but if the assured have a less estate therein, or if the property or premises are incumbered, policies shall be void, unless the true title of the assured and the incumbrances on the same be expressed therein." The claim of the company, that, as to them, the general law of 1855 was modified and superseded by the special act of 1862, was not sustained. On the ground of a presumed legislative intent to maintain equality and uniformity, the special act was held to operate in harmony with and subject to the general law. "The general drift of the constitution is distinctly hostile to the creation of discriminating and unreasonable privileges and immunities. . . . It is difficult to overestimate the weight of the natural presumption that the legislature did not intend either to pass an act that would be void, because evidently a breach of constitutional obligations, or to pass one that would so far indirectly defy the general spirit of the paramount law, — though not in direct, open, and violent conflict with any of its specific provisions, — as to be of doubtful validity. It is always to be presumed — and the presumption is to stand until the contrary is shown by an immense preponderance of evidence — that the legislature have not intended to disregard the doctrine of equal rights upon which our institutions are founded." DeLancey v. Ins. Co., 52 N.H. 581, 592. "Corporate powers are conferred in subordination to the general laws of the land, and are so to be construed." Tyng v. Warehouse Co., 58 N.Y. 308, 314. "The charter of a corporation is not presumed . . . to exempt it from subordination to general laws." Pierce R. R. 494. "Presuming that all are equal before the law, we must administer it equally to all who do not clearly show their special exemption, shadowed by no doubts in its interpretation" Kupfert v. Association, 30 Pa. St. 465, 470.
"Equality of rights, privileges, and capacities unquestionably should be the aim of the law; and if special privileges are granted, or special burdens or restrictions imposed in any case, it must be presumed that the legislature designed to depart as little as possible from this fundamental maxim of government. The state, it is to be presumed, has no favors to bestow, and designs to inflict no arbitrary deprivation of rights. Special privileges are always obnoxious, and discriminations against persons or classes are still more so; and, as a rule of construction, it is to he presumed they were probably not contemplated nor designed." Cool. Const. Lim. 485. "It is manifestly contrary to the first principles of civil liberty and natural justice, and to the spirit of our constitution *Page 664 
and laws, that any one citizen should enjoy privileges and advantages which are denied to all others under like circumstances." Ho den v. James,11 Mass. 396, 405; In re Dorsey, 7 Por. 293, 360-362. In Janesville v. Carpenter, 77 Wis. 288, the principle of equal and general laws was held to be essential to a free government. Of the special act of 1887, c. 423, the court say (p. 302), "This statute is discriminating and class legislation, in violation of the spirit of our constitution. . . . It gives to a certain class of citizens privileges and advantages which are denied to all others in the state under like circumstances." "It . . . affords a safe rule of construction for courts, in the interpretation of laws admitting of any doubtful construction, to presume that the legislature could not have intended an unequal and unjust operation of its statutes. Such a construction ought never to be given to legislative language if it be susceptible of any other more conformable to justice." Cochran v. Van Surlay, 20 Wend. 365, 382. "All statutes are to be construed as far as possible in favor of equality of rights." In re Hall, 50 Conn. 131, 137.
In some jurisdictions, inequality, resulting from an excess of special legislation, has been aggravated by construction. On this subject, as on others, the intention of the legislature, instead of being ascertained by a fair and reasonable consideration of all competent evidence, has sometimes been determined by an arbitrary rule. In practical effect, a rigid application of the rule amounts to a legal presumption of a legislative intent that special laws shall override general ones, both previous and subsequent. End. Interp. Stat., s. 223; Suth. Stat. Const., s. 157; Sedg. Stat. Law 361; Pott. Dwarris 273. In some states the growing evil has been met by constitutional amendments, prohibiting special legislation in cases for which provision can be made by general law, and requiring that laws of a general character shall have a uniform operation throughout the state. Cool. Const. Lim. 152 n. In this state, more than elsewhere, legal effect has been given to the general declarations of the bill of rights, in which uniformity and equality are laid down as a rule of government.
In 1827, the justices, answering a question proposed by the house of representatives, expressed the opinion that "the legislature cannot authorize a guardian of minors, by a special act or resolve, to make a valid conveyance of the real estate of his wards." "Under our institutions, all men are viewed as equal, entitled to enjoy equal privileges, and to be governed by equal laws. If it be fit and proper that license should be given to one guardian, under particular circumstances, to sell the estate of his ward, it is fit and proper that all other guardians should, under similar circumstances, have the same license. This is the very genius and spirit of our institutions. And we are of opinion that an act of the legislature to authorize the sale of the land of a particular minor by his guardian, cannot be easily reconciled with the *Page 665 
spirit of the article in the bill of rights which we have just cited." Opinion of the Justices, 4 N.H. 572-574. Notwithstanding the prevalence of a different view elsewhere (Cool. Const. Lim. 115-122, 479), the opinion given in 1827 has been accepted in this state as sound, and the reasoning on which it was based has been applied to other classes of cases. McDuffee v. Railroad, 52 N.H. 430, 454, 455; Greenville v. Mason, 53 N.H. 515, 518; Bowles v. Landaff, 59 N.H. 164, 194, 195; Gould v. Raymond, 59 N.H. 260), 275, 278; State v. U.S. Express Co., 60 N.H. 219, 236, 238, 250, 251, 256; Wooster v. Plymouth, 62 N.H. 193, 217; State v. Pennoyer, 65 N.H. 113-115, 117. So far as equality of right depends upon the uniform and general character of legislation, the settled constitutional policy of the state is evidence of the meaning of many statutes, there being a presumption that they were not intended to conflict with that policy. The construction that favors and extends inequality by assuming the precedence and superiority of special laws having been rejected on the ground that it is not consistent with fundamental principles, the view held to be erroneous need not be further considered.
A lack of uniformity may result from the exercise of limited powers of local government granted to towns and cities. Cool. Const. Lim. 207, 223-231, 281, 282; State v. Hayes, 61 N.H. 264. The legislature may be of opinion that the peculiar circumstances of a town, a business corporation, or an unincorporated person, make a case in which there should be an exception to the general law of the land (Cool. Const. Lim. 479, 180, Brown v. Lowell, 8 Met. 172, 171); and the exception may be clearly enacted. When there have been special and general laws relating to the same subject, and it becomes necessary to determine which are in force, the first question is the competency of evidence. The effect of the act of 1844 and its repeal is a question of legislative intent; and the evidence includes the general and special character of various acts, and a presumed legislative regard for equal rights and for the convenience and justice of uniform law.
A special act is not to be declared void because it is opposed to a spirit supposed to pervade the constitution, but not made an operative part of it by express words or necessary implication, that is, by fair construction. Cool. Const. Lim. 87, 204. But the principle of equality declared in the bill of rights cannot be classed with matters of conjecture and uncertainty. If it had not been held to be law, it would be a correct statement of the spirit of our institutions, and would be properly considered on many questions of statutory construction. The meaning of a written law is not found, beyond the fair scope of its terms, in a subsequent public policy, or a policy not sufficiently established at the date of the act to be presumably known to the legislature. Sto. Const., s. 426; Suth. Stat. Const., s. 407; End. Interp. Stat., s. 5; Hadden v. Collector, 5 Wall. 107, 111, 112. A part of the *Page 666 
evidence tending to show the fair scope of the acts of 1844 and 1867, is a policy adverse to the unnecessary introduction or maintenance of unequal rights by special legislation, — a policy as old as the constitution, and distinctly stated in the Opinion of the Justices given to the house of representatives before 1844. Those acts could have been so written as to make it certain that the legislature of 1844 intended to introduce inequality among railroad companies by subjecting some to the operation of ss. 10, 11, 12, 13, 14, 15, and 16 of c. 128, and leaving others under different regulations, and that the legislature of 1867 intended, by the repeal of that chapter, to relieve some from a supposed danger of being compelled to sell their property for less than its value, and to leave others exposed to that danger. No such purpose is expressed, and an imputation of it would not be a fair or reasonable construction. If such a purpose had been expressed in unmistakable terms, it would have been necessary to inquire on what ground it could be reconciled with the paramount law of equal right. State v. Sheriff, 48 Minn. 236.
"By the constitution of 1846 . . . corporations were authorized to be formed under general laws, and the creation of any, except for municipal purposes and in cases where the objects of the corporation could not . . . be attained under the general laws, was prohibited. One design was, that all that desired to transact business in a corporate capacity might do so upon an equality, and with equal privileges and liabilities, with uniform powers and under uniform restraints. Equality between corporations themselves, as well as equality between corporations and individual citizens, so far as the latter was practicable, was in the minds of the convention in framing this part of the constitution." Johnson v. Railroad,49 N.Y. 455, 458. To some extent a similar purpose is accomplished by the view taken of the bill of rights in 4 N.H. 572, and other cases before cited, and by the presumption of intended equality.
It may not be important whether, in form and name, laws are general or special, public or private. Their practical effect is the vital question. In character and operation, there is a wide difference between a general act making a universal rule, and a special act making a rule for a particular person or case; but of the ancient distinction between public and private legislation, nothing is left of any significance in the present inquiry. Gen. St., c. 242, s. 10. "In regard to private statutes, resolutions, c., the only mode of proof, known to the common law, is either by means of a copy, proved on oath to have been examined by the roll itself; or by an exemplification under the great seal. . . . It is the invariable course of the legislatures of the several states to have the laws and resolutions of each session printed by authority. . . . The very object of this provision is to furnish the *Page 667 
people with authentic copies; and from their nature, printed copies of this kind, either of public or private laws, are as much to he depended on as the exemplification, verified by an officer who is a keeper of the record." 1 Gr. Ev., s. 480; Hall v. Brown, 58 N.H. 93. By c. 224, Laws 1835, it was made the duty of the secretary of state to cause to be printed, in pamphlet form, "all the public and private acts, and resolutions of a public nature, passed at" each session of the legislature. In Perry v. Keene, 56 N.H. 514,537, Judge Ladd examined the provisions of private acts, printed in pursuance of general law. In Concord Railroad v. Greely 17 N.H. 47, 62, and in Great Falls Manf. Co. v. Fernald, 47 N.H. 444, 449, 450, 459, 460, judicial notice was taken of the public record of many private acts passed before 1835, and not printed.
"Whether an act is public or private does not depend upon any technical considerations, . . . but upon the nature and substance of the case." Dawson v. Paver, 5 Hare 415, 434. "Whether a statute be a law of a general nature or not, depends upon its subject-matter, and not upon its form." State v. Ellet, 47 Ohio St. 90, 94. "Acts may be local and special, immediately designed to affect only a part of the territory or people under the jurisdiction of the law-making power, . . . and yet be public because being intended for a public object. Thus, acts, to organize corporations for canals, railroads, or turnpikes, when they contain provisions affecting the general public, . . . are, in this country, public acts." Suth. Stat. Const., s. 193. "A statute, local or private in many of its provisions, may contain a section which is of a public or general character, and to be noticed as such." End. Interp. Stat., s. 504. Several laws of a public and general character, both civil and criminal, were naturally inserted in railroad charters before a general system of railroad law was embodied in acts called public. Being, in fact, general laws, they are to be regarded as such: and this view of them is material, the difference between general and special legislation being evidence to be considered in construing the act of 1844, and determining the effect of its repeal. When laws of a public and general character were transferred, with or without modification, from charters to statutes called public, the transfer was made, generally if not always, without express mention of the acts in which they were originally written. Upon the established rule of construction, the transfer, when made, as in 1844, for the purpose of revision and codification, would ordinarily be a repeal, so far as a repeal would be an exercise of legislative power.
The provisions of previous charters on the subjects covered by the act of 1844 were disposed of by s. 21, which repealed "all acts and parts of acts inconsistent with the provisions of this act." If s. 21 had been omitted, many sections of that act would have been *Page 668 
a repeal. "A subsequent statute, revising the whole subject-matter of a former one, and evidently intended as a substitute for it, although it contains no express words to that effect, must, on the principles of law, as well as in reason and common sense, operate to repeal the former." Bartlet v. King, 12 Mass. 536, 545. "When a statute directs something to be done in a certain event, and another law is made which appoints something else to be done, not contradictory, but more comprehensive and including the former, I cannot help thinking that the first act is gone." Bramwell, B., in In re Baker, 2 H. N. 219, 242. "Even though two statutes, relating to the same subject, be not in terms repugnant or inconsistent, if the later statute is clearly intended to prescribe the only rule which should govern the case provided for, it will be construed as repealing the original act. The rule does not rest strictly upon the ground of repeal by implication, but upon the principle that when the legislature makes a revision of a particular statute, and frames a new statute upon the subject-matter, and from the framework of the act it is apparent that the legislature designed a complete scheme for this matter, it is a legislative declaration that whatever is embraced in the new law shall prevail, and whatever is excluded is discarded. It is decisive evidence of an intention to prescribe the provisions contained in the later act as the only ones on that subject which shall be obligatory." Roche v. Mayor, 40 N.J. Law 257,262; Bracken v. Smith, 39 N.J. Eq. 169, 172; Giddings v. Cox, 31 Vt. 607,609; State v. Smith, 63 Vt. 201, 208; Ellis v. Paige, 1 Pick. 43, 45; Leighton v. Walker, 9 N.H. 59; Jewell v. Warner, 35 N.H. 176, 182; Wakefield v. Phelps, 37 N.H. 295, 305; State v. Otis, 42 N.H. 71, 73; State v. Wilson, 43 N.H. 415, 419; Hillsborough Co. v. Manchester, 49 N.H. 57,60; Towle v. Marrett, 3 Me. 22, 26; Heckmann v. Pinkney, 81 N.Y. 211, 215; People v. Gold and Stock Telegraph Co., 98 N.Y. 67, 78; Horton v. Cantwell,108 N.Y. 255, 263, 264; Anderson v. Anderson, 112 N.Y. 104, 110, 111; In re New York Institution, etc., 121 N.Y. 234, 239-241 Cromwell v. MacLean,123 N.Y. 474, 485; Fayette County v. Faires, 44 Texas 514[44 Tex. 514], 517; Suth. Stat. Const., ss. 154, 155, 156.
"Whether a subsequent statute repeals a prior one in the absence of express words, depends upon the intention of the legislature, and one of the tests frequently resorted to to ascertain whether there is a repeal by implication, is to inquire whether the special and general acts may both be executed without involving repugnancy of rights or remedies. In some cases the question has been solved by holding that the general act was intended to declare a general rule governing cases not already provided for, and that a prior special statute on the same subject, operating upon a single person or class of persons, or within a limited territory, should be treated as if specially excepted from the operation of the general law. It will be found, I think, on examining the cases in which *Page 669 
the courts have held that a special law was not repealed by a subsequent general law on the same subject, that they are, as a general rule, cases where the legislature was not dealing directly with the subject of the prior law, and it was not in the mind of the legislature when the general law was enacted, or where the special law was part of a system of local administration, or where it was possible to assign a reasonable motive for retaining the special and peculiar provisions of the special act, notwithstanding the enactment of a subsequent general rule covering the same subject. The case is within the rule that a later statute, covering the same subject-matter and embracing new provisions, operates to repeal the prior act, although the two acts are not in express terms repugnant." People v. Jaehne, 103 N.Y. 182, 194, 195.
"Where two acts are not in express terms repugnant, yet if the latter act covers the whole subject of the first and embraces new provisions, plainly showing that it was intended as a substitute for the first act, it will operate as a repeal of that act." United States v. Tynen, 11 Wall. 88, 92; District of Columbia v. Hutton, 143 U.S. 18, 25, 26, 27. In Murdock v. Memphis, 20 Wall. 590, one question was whether all or any part of s. 25 of the judiciary act of 1789 was repealed by s. 2 of an act of 1867. "The act of 1867," say the court (pp. 616, 617), "has no repealing clause, nor any express words of repeal. If there is any repeal, therefore, it is one of implication. . . . There is no repeal by positive new enactments inconsistent in terms with the old law. . . . A careful comparison of these two sections can leave no doubt that it was the intention of congress, by the latter statute, to revise the entire matter to which they both had reference, to make such changes in the law as it stood as they thought best, and to substitute their will in that regard entirely for the old law upon the subject. We are of opinion that is was their intention to make a new law so far as the present law differed from the former, and that the new law, embracing all that was intended to be preserved of the old, omitting what was not so intended, became complete in itself, and repealed all other law on the subject embraced within it. The authorities on this subject are clear and uniform." "While repeals by implication are not favored, it is well settled that where two acts are not in all respects repugnant, if the latter act covers the whole subject of the earlier, and embraces new provisions which plainly show that it was intended as a substitute for the first, it will operate as a repeal." King v. Cornell,106 U.S. 395, 396; Fisk v. Henerie, 142 U.S. 459, 468. "If a particular statute is clearly designed to prescribe the only rules which should govern the subject to which it relates, it will repeal any former one as to that subject." Cook County National Bank v. United States, 107 U.S. 445, 451; Tracy v. Tuffly, 134 U.S. 206, 223.
If s. 3 of c. 230, Rev. St., had been omitted, the sections of railroad charters passed before 1842, making it a crime maliciously to *Page 670 
obstruct the passage of cars would have been superseded as to future cases by Rev. St. c. 215 s. 3 (relating to malicious obstruction), without express words of repeal and without express mention of charters. The charter provisions on the subject would have remained in force only as to offences committed before the later act took effect and would have been repealed by the repeal of the later act.
Of three New York statutes the court say, "The only question . . . is whether the act . . . of 1874 repealed the act of 1867 as well as that of 1873. . . . By the law of 1873, that of 1867 was not repealed; but from the time the former was passed it became the law as to all proceedings thereafter, while all that had been done before that time was supported by the first act and must be judged by it. At the time of the passage of the repealing act of 1874, by which the act of 1873 was, in terms and by reference to its title and the date of its passage, repealed, the act of 1873 was the only law in force. The earlier statute had been merged by being incorporated and united with new provisions in the amendatory act substituted for it. . . . With us the amendment of a statute or part of a statute, by making the same read as prescribed by the amendatory statute, thus incorporating all that is deemed desirable to retain of the old law in the new, is not regarded as a repeal of the parts thus transferred, but from the time of the passage of the new statute, the whole force of the enactment rests upon the later statute. Although the former act remains upon the statute-book, and is not repealed, either expressly or by implication, it is no longer the law of the land in respect to new cases that may arise. . . . The substance and body of the act of 1867 was incorporated in and made a part of the act of 1873; the latter statute was but a modification of the details for giving effect to the intention of the legislature. . . . The details of both statutes, and all the matters in respect to which the act of 1873 differed from that of 1867, were incidental to the main purpose. During the existence of the law of 1873, no part of the law of 1867 was in force, or could be referred to for any purpose, except to sustain past transactions under it. . . . The statute which the legislature did in terms repeal was the only law in force at that time under which the relator and others similarly situated had any right to relief, . . . and . . . the former act upon that subject was by incorporation merged in it, and had no vitality distinct from it. So long as statutes must have effect according to the intent of the legislature as manifested by the language employed, and in the light of the circumstances under which the acts are passed, there could hardly be, without express words, a stronger manifestation of an intent to abrogate all legislation giving . . . a claim upon the county, . . . than by a law in terms repealing the only statute in force which embodied the only other statute that *Page 671 
had been passed upon the subject. . . . The statute of 1867 was annulled for all practical purposes by its merger in the statute of 1873; and when the latter act was repealed it as effectually annihilated the act of 1867 as if the same had been expressly mentioned in the repealing act." People v. Supervisors of Montgomery County, 67 N.Y. 109, 116-120. If s. 17 of the Concord charter had been of such a character as to be applicable to past transactions after the passage of the act of 1844, it would have been repealed by the express and unqualified repeal of the later act. As it was not of that character, its supersedure by the later act was a repeal.
The first nine sections of the act of 1844, authorizing the exercise of the power of eminent domain were a substitute for s. 1 of c. 142, Rev. St., which provided that "No railroad corporation shall take any land for the use of such corporation, without the consent of the owner thereof." The corporations to which those nine sections apply are described in s. 3 as "all railroad corporations which now are or shall hereafter be chartered by the authority of this state, and which shall be unable to purchase the lands for their roads of the owners on their respective routes, at rates to be agreed upon by the parties." No distinction is made between companies chartered before and companies chartered after the passage of the act and such a discrimination is disclaimed by the express terms of s. 3. No distinction is made between companies who had built roads, those who were building them, and those who had not begun the work of construction. How much land would be needed in the course of time, by any company, could not be known when their road was laid out, or when it was built. A company who had built their road and afterwards needed more land for the performance of their public duty (Ranlet v. Railroad, 62 N.H. 561 Low v. Railroad,63 N.H. 557), could obtain it by eminent domain under the first nine sections of the act of 1844. Companies purchasing what they wanted by agreement with the owners would have no occasion to resort to the compulsory process.
The subject-matter of sections 10, 11, 12, 13, 14, 15, and 16 is evidence that they were intended to apply to "all railroad corporations which now are or shall hereafter be chartered." Section 10 relates to the state's right to but railroads, s. 11 to accounts and reports, and an excess of net income above ten per cent., s. 12 to the transportation of the state's troops and munitions in time of war, and other subjects s. 13 to the alteration of tolls when the net income exceeds ten per cent., s. 14 to the carriage of stockholders and officers, s. 15 to the right of all persons to use the tracks as turnpikes, and s. 16 to the general performance of railroad duty. Corporations who might succeed in efforts to purchase what they wanted without resorting to eminent domain, and corporations who had built their roads and might have the singular fortune to want no more land are the only ones who could, by *Page 672 
any construction, be exempt from the operation of the general law enacted in those sections. There was no reason for exempting them. If an exemption from that law had been designed, it would not have been based on so irrelevant a circumstance as a purchase of land by agreement, or the absence of a desire for more. The exemption would introduce unequal right and unequal duty in contravention of the manifest intent of the legislature and the settled mode of construction.
A public turnpike, railroad, or other highway is a way which the public have a right to use. While it is only for public use that the right of way can be taken from the landowners without their consent, the public right is the same whether the landowners consent or object. If they give the easement by deed to induce the laying out and building of the way, the public right is what it would be if the landowners had unsuccessfully opposed the laying out, and contested the assessment of damages. This was the view held by the legislature in s. 15, where they laid down a general rule of railroad easements on a point which might be a subject of controversy. The absurdity of making the application of the rule depend upon the question whether the right of way was acquired with or without the landowners' consent, or whether a company wanted more land, is stronger evidence of what the legislature meant than the words "such corporations," which may refer to railroad corporations in general, as well as to a particular class. Of the two constructions of which the expression "such corporations" is capable, one treats the right of way as equally including a right of the state to allow all persons to put cars on the track, or to run their own locomotives and cars, whether the easement was obtained by eminent domain or by agreement, and whether the company wants more land or not; the other employs an immaterial fact as the test of this part of the public right. One construction makes the section an intelligent exercise of legislative power; the other sets up a groundless and unreasonable discrimination. One ascertains the lawmakers' purpose from competent evidence; the other takes a superficial view of a single word, and rejects conclusive proof of the meaning. The argument on s. 15 is decisive as to all the sections between the ninth and the seventeenth.
"Sec. 10. The state may, at any time after twenty years, resume the right and privilege of the corporation in such railroad, on giving one year's notice, and paying to the corporation all it may not have received of its expenditures, and interest on such expenditures at the rate of ten per cent. per annum." In this law, as in the argument of counsel, and the phraseology in common professional use before and since 1844 (ante, pp. 635, 636, 637), "resume" was a technical word that may be understood in the technical sense (Cool. Const. Lim. 74, Sedg Stat. Law 221, 224, Suth. Stat. Const. ss. 253, 254, 346, End. Interp. Stat. ss. 74, 75, United States v. Smith, 5 Wheat. 153, 159, 160, The "Abbotsford," *Page 673 98 U.S. 440, 444), which signifies a taking for public use of property held under the universal right of eminent domain, commonly called the "right of resumption," and the "ultimate proprietorship of the state." The word was equally appropriate whether the property was or was not held under a lease authorized by s. 8. In drafting a section designed to remedy a defect in the power of eminent domain, if that power should be found defective, a person conversant with legal terms, using a familiar form of expression, might well suppose it would be interpreted in the sense in which it is habitually used.
The words "such" in ss. 10, 11, 12, 15, and 16, "said" in s. 14, "all" in s. 17, "each" in s. 18, and "any" in s. 19, are to be weighed with all other competent evidence on the question of legislative intent. If ss. 17, 18, and 19 had been inserted between s. 9 and s. 10, the meaning would have been expressed with exactness. In Poor v. Considine, 6 Wall. 458, 461, there was a difference of opinion on the question whether, from the mere collocation of the fourth and fifth clauses of a statute, it was to be inferred that land devised to a grandchild who died childless and intestate, should go to the testator's brothers and sisters instead of to his children. The evident intention of the legislature required the fifth clause to be read before the fourth and in this state the mere order in which they were arranged would not defeat that intention. End. Interp. Stat. ss. 70, 295, 318. It is impossible to believe that while all railroad companies were to be subject to ss. 17, 18, 19, and 20 of the act of 1844, some companies were to be exempt from ss. 10, 11, 12, 13, 14, 15, and 16. An examination and comparison of all the sections from the tenth to the twentieth inclusive shows that such a discrimination could not have been intended. The legislature could have inserted this proviso: The public rights asserted in ss. 10, 11, 12, 13, 14, 15, and 16 shall depend upon railroad corporations needing more land, or upon a single landowner on the route of each road refusing to sell, or demanding a higher price than the company is willing to pay, or being an infant or insane person incapable of making a contract. — Without an explicit enactment to that effect, it cannot be held that the senate and house intended on such grounds, to break in upon the principle and practice of uniform and equal legislation. The provision for "one year's notice" is evidence that s. 10, like subsequent sections, was a revision of the law. There was no occasion to withhold from any company the notice to which others were entitled.
Section 10 of the act of 1844, repealed in the revision of 1867 (Gen. St. c. 273, s. 14), was not reenacted in that revision, as it would have been if the legislature had intended it should remain in force. If s. 5 of the repealing chapter were applicable to the right of resumption so called, it would be in effect, a reenactment of s. 10 of the act of 1844 as the law of all railroads in existence at the time of the repeal. Such a reenactment would have made the *Page 674 
repeal a mere exemption of other roads from the operation of the repealed section. A construction giving this effect to ss. 5 and 14 of the repealing chapter would put all undesigned and novel inequality in the place of uniformity, in violation of elementary principles established by authorities that have been cited. The intention was to repeal a law that had been found useless for the purpose for which it was made, and by the repeal to recognize the equality of owners of railroads and owners of other property, and not to divide railroad companies into classes, in order to subject one class to, and exempt another class from, a risk of being compelled to sell their property for less than its value. The object of s. 10 of the act of 1844 being neither to acquire a right of buying railway property for the purpose of selling it (ante, p. 647), nor to acquire a right of compelling the owners to sell it for less than its value, but to acquire a power of taking corporate railway property for public use if it could not be taken by eminent domain, this power of resumption was regarded in 1867 as a sovereign power of legislation unnecessarily reserved in the act of 1844, and not as one of the vested rights of action or property necessarily excepted from the effect of repeal in every general revision of the statutes.